WHITE EARTH BAND OF CHIPPEWA INDIANS, Plaintiff,

v.

Joseph N. ALEXANDER, individually, and as Commissioner of Natural Resources for the State of Minnesota, and Fredean C. Hammer, Director of the Division of Enforcement and Field Service for the Department of Natural Resources, Defendants,

and

Counties of Mahnomen, Clearwater, and Becker, Intervenors-Defendants,

and

Elmer H. Winter, Kenneth Albertson, Joe Klinkbomme, Ed Grahame, Intervenors-Defendants.

UNITED STATES of America, Plaintiff,

v.

STATE OF MINNESOTA, Defendant.

Civ. Nos. 3–74–63, 3–74–305.

United States District Court, D. Minnesota, Third Division.

June 25, 1981.

Kent P. Tupper and Peterson, Tupper & Smith, Walker, Minn., and Bernard P. Becker, St. Paul, Minn., for plaintiff White Earth Band of Chippewa Indians.

Thomas K. Berg, U. S. Atty., Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., John Jacobsen, Washington, D.C., for the United States.

Warren Spannaus, Atty. Gen. of State of Minn., James M. Schoessler, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Minn. and Minn. Dept. of Natural Resources.

Alfred Schmidt, Bemidji, Minn., for individual intervenor-defendants.

Tom D. Tobin, Winner, S.D., and David Albert Mustone, Tobin Law Offices, Washington, D.C., for county intervenor-defendants.

## MEMORANDUM AND ORDER

DEVITT, Senior District Judge.

This is an action brought by the White Earth Band of Chippewa Indians seeking declaratory relief to determine the Band's rights to hunt, fish, trap and gather wild rice on the White Earth Reservation without regulation or licensing by the defendants, and whether the Band has jurisdiction to regulate hunting, fishing, trapping, and wild rice gathering within the White Earth Reservation. The Band seeks permanent injunctive relief prohibiting defendants from enforcing hunting, fishing, trapping, and wild rice laws of Minnesota within the boundaries of the White Earth Reservation.

The action commenced by the Band was consolidated with a case filed by the United States seeking to prevent the State of Minnesota from enforcing its hunting, fishing, and trapping laws against Band and Chippewa Tribe members on the White Earth reservation. Three Minnesota counties and four individuals were permitted to intervene in the action brought by the Band.

The issues before us have been significantly narrowed during the pendency of this litigation. This action was held in abeyance by agreement of the parties and with the approval of this court while several of the issues were litigated in state court in the context of prosecutions of Indians for state hunting and fishing law violations on the White Earth Reservation. These prosecutions were consolidated on appeal before the Minnesota Supreme Court in *State of Minnesota v. Clark*, 282 N.W.2d 902 (Minn. 1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980) (*"Clark"*).[1]

In *Clark*, the issue before the court was whether the state has jurisdiction to enforce its game and fish laws against enrolled members of the White Earth Band on non-Indian owned land within 32 of the 36 townships within the White Earth Reservation as established by the Treaty of March 19, 1867, 16 Stat. 719, II Kappler 974 ("Treaty of 1867"). In affirming lower court dismissals of the prosecutions, the Minnesota court held that the White Earth Reservation was not disestablished by the Nelson Act of 1889, 25 Stat. 642, I Kappler 301 ("Nelson Act"), and thus that the state's jurisdiction over Indian hunting and fishing on the reservation was limited by P.L. 280, 18 U.S.C. § 1162(b). *Id.* at 908. The court further held that the Indians have aboriginal rights to hunt and fish that were extinguished by the Treaty of February 22, 1855, 10 Stat. 1165, II Kappler 685 ("Treaty of 1855"), but were later reacquired in the Treaty of 1867, and were never thereafter extinguished. *Id.* at 909. The Minnesota court concluded that the state is without jurisdiction over Indian hunting and fishing activities on the White Earth Reservation. *Id.*

Following the *Clark* decision, the Band moved to preclude defendants from relitigating the issue of whether the Nelson Act disestablished the White Earth Reservation. The court granted that motion by order dated May 30, 1980. The United States thereafter amended its complaint to seek no greater relief than that accorded by the *Clark* decision.

A recent decision of the United States Supreme Court has also narrowed significantly the issues before us. The Band has

---

1. By agreement of the parties, the stipulated facts and exhibits from the *Clark* case are made part of the record herein.

taken the position throughout this litigation that it has jurisdiction to regulate hunting, fishing, trapping, and wild rice gathering by non-members on all reservation lands, including lands held in fee by non-Indians. In *United States v. Montana*, —— U.S. ——, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Court rejected a similar claim made by the Crow Tribe of Montana with reference to the Crow Reservation, holding that the Indians had no authority to regulate non-Indian hunting and fishing activities on non-Indian lands within the reservation. The parties agree that the *Montana* case disposes of the same issue as it is presented here.

Several issues remain. They are 1) whether the White Earth Reservation includes the four northeastern townships ceded to the United States in 1889 pursuant to the Nelson Act, and 2) whether the Band has jurisdiction to regulate hunting, fishing, trapping and wild rice gathering by non-members on land owned by or held in trust for the Band or individual Indians, and 3) whether the state has authority to regulate these activities on Indian-owned and trust land.

## I. The Reservation Status of the Four Northeastern Townships.

 The rules of construction applicable to treaties and agreements involving land cessions between Indians and the government require that cession treaties and agreements be interpreted as the Indians understood them, and that doubtful expressions be resolved in favor of the Indians. *See, e. g., Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970); *Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). Likewise, in construing statutes that purportedly terminate the reservation status of any part of an Indian reservation, congressional intent to do so must be clear, and doubtful expressions must be resolved in favor of the Indians. *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43

L.Ed.2d 300 (1975) ("*DeCoteau*"); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586–87, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977). That congressional intent must " 'be expressed on face of the Act or be clear from the surrounding circumstances and legislative history.' " *Id., quoting, Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92. This court does not however have a license to remake history where there are clear expressions of tribal and congressional intent. *Id.* at 447, 449, 95 S.Ct. at 1094, 1095.

The White Earth Band of Chippewa Indians is one of six Chippewa bands comprising the Minnesota Chippewa Tribe. The White Earth Reservation was established by the Treaty of 1867, and consisted of 36 townships of land in a square form, consisting of townships 141 through 146 North, Ranges 37 through 42 West, 5th Principal Meridian. The four northeastern townships [2] of the original reservation were ceded to the United States by an agreement made July 20, 1889 between the White Earth Band and the United States pursuant to the Nelson Act. The agreement provided that the band did "grant, cede, relinquish and convey to the United States all ... [their] ... right, title and interest ..." in those townships.

The four northeastern townships are comprised of approximately 92,000 acres. Following the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U.S.C. § 476, approximately 2,900 acres of these townships were returned to trust status. *Clark* Stipulation ¶ 37.

The Nelson Act was designed to accomplish an assimilation of the Indians into non-Indian society by breaking up the reservation system, and allotting lands in severalty to individual Indians. It was intended that unallotted lands would be sold. *See* H.R.Rep.No.789, 50th Cong. 1st Sess. 6 (1888). This is consistent with the general policy of Congress at that time to encourage Indians to adopt an agricultural lifestyle, as evidenced by the enactment of the

---

**2.** Townships 146, 145, 144 and 143 North of Range 37 West.

Dawes Act in 1887. *See* Act of Feb. 8, 1887, c. 119, 24 Stat. 388. The Nelson Act sought to effectuate this end by providing for the

> complete cession and relinquishment . . . of all . . . title and interest in and to all the reservations of . . . [the Chippewa Indians in the State of Minnesota] . . . except the White Earth and Red Lake Reservations, and to all and so much of these two reservations as . . . is not required to make and fill the allotments required by this and existing acts. . . .

Cession and relinquishment were to be complete upon approval by the requisite number of Indians belonging to the respective reservations, and upon approval by the President. *Id.*

The Act provided that cession and relinquishment of the reservations was to be negotiated by a commission appointed for that purpose. A three member commission, known as the Rice Commission, after member Henry M. Rice, was appointed in 1889.

The Rice Commission negotiated with both the Red Lake and the White Earth Bands of the Chippewa Indians for cession and relinquishment of certain lands. The Rice Commission was instructed by the Commissioner of Indian Affairs that, in implementing the provisions of the Nelson Act, the Commission was to accomplish the "full cession and relinquishment . . . to all and so much of the . . . White Earth . . . [reservation] . . . as in the judgment of the Commission is not required to make the allotments." Letter from Commissioner of Indian Affairs to Commissioners, May 24, 1889, *Clark* State Exhibit S–K. Those instructions also required that the Commissioners precisely define for the White Earth Indians the cession of any lands on the White Earth Reservation:

> The boundaries of the tracts so reserved by you (the diminished White Earth and Red Lake Reservations) must be definitely determined and fixed and accurately described so that the Indians interested therein may be able to act intelligently and with a thorough knowledge as to just what and how much land they are part-

ing with by cession and relinquishment to the United States, and in order that the deed of acceptance, cession and relinquishment may describe the cession in a manner that cannot be mistaken or misunderstood.

*Id.* at 11–13.

The transcripts of the negotiations between the Rice Commission and the Indians clearly reflect that the proposed cession of the four townships was fully considered by the Indians, and that it was understood that the reservation would be diminished by cession of those lands. *See* Transcript of Council at White Earth, July 17–29, 1880, House Exec. Doc. No. 247, 51st Cong. 1st Sess., 85–116 (1890), *Clark* State Exhibit SL.

In *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn.1979), *affirmed sub nom, Red Lake Band of Chippewa Indians*, 614 F.2d 1161 (8th Cir.), *cert. denied*, 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980), this court considered whether the Red Lake Band of the Minnesota Chippewa Indians relinquished all their right, title and interest in lands ceded to the United States in 1889 and 1904. An examination of the language of the Nelson Act, its legislative history, the negotiations, and the subsequent construction given to the enactment and relevant agreements compelled a conclusion that all property rights of the Red Lake Indians in the ceded lands had been terminated. There, as here, the express language of the Nelson Act and its legislative history reveal a clear congressional intent to extinguish all property rights in the ceded lands.

Moreover, the negotiations conducted by the Rice Commission with the Red Lake Band in connection with the Red Lake cessions made it clear that no property rights would survive in the ceded lands. *Id.* at 1387. The same commissioners subsequently communicated the same message to the White Earth Indians in connection with the cession of the four northeastern townships. That the intent was the same with regard to the four townships is manifested by a statement made by Commissioner Rice to

the White Earth Band at the Sixth Council at White Earth on July 24, 1880:

> Now, should your present reservation be reduced: should some townships be taken off, that land will have the same status as the land just ceded at Red Lake. We are distinctly of the opinion that for your own safety and protection you should part with a small portion of this reservation. Power is given us under the act to reduce it if we see fit, but we are not going to exercise any power which would be injurious to you.

H.R.Exec.Doc. No. 247, *supra* at 96. The agreement ultimately signed by the White Earth Indians contained language identical to that found in the Red Lake agreement. Both agreements recited that the Indians "do hereby grant, cede, relinquish, and convey to the United States all our right, title, and interest in and to all and so much of said . . . . Reservation as is not embraced in the following described boundaries . . ." *Id.* at 27, 38; *see United States v. Minnesota,* 466 F.Supp. at 1385.

The Band argues that the final draft of the Rice Commission Reports as it pertains to the White Earth Reservation does not accurately reflect the negotiations between the Band and the Rice Commission. The Band offers as evidence early drafts of the proceedings during the councils at Red Lake, Bois Forte, Mille Lacs, Grand Portage, Gull Lake, Fond du Lac, Leech Lake, Cass Lake, White Oak Point, and Winnebagoshish. *See Alexander* Band Exhibits 16–35. These early drafts were found at the Regional Branch of the National Archives in Kansas City. If an earlier version of the White Earth Council exists, it could not be located.

The Band argues that the unedited earlier drafts contain substantial differences from the final report of the Commission, which were published as H.Exec.Doc. 247, 51st Cong., 1st Sess. (1890). These differences purportedly show that the final report did not accurately reflect the understanding of the Indians of the Nelson Act and the cession of reservation lands. The Band takes the position that these allegedly substantial differences compel a conclusion that the White Earth Indians never intended to cede all their right, title and interest in the four northeastern townships to the United States.

We have examined all early drafts of the Rice Commission Reports introduced by the Band. We do not agree that the differences between the early and final version of the Rice Commission Reports are substantial ones. Nor are we persuaded that any such differences support a conclusion that the White Earth Indians did not intend to unconditionally relinquish their interest in the four northeastern townships. The minor changes in the record of the Red Lake Council, which immediately preceded the White Earth Council, and involved a similar cession of a portion of the Red Lake Reservation, and the record of the White Earth Council, which reflects a thorough airing of Indian concerns regarding the cession, convince us that the final version of the Rice Commission Report accurately reflects the understanding of the Indians with reference to the cession of the four northeastern townships. *See Alexander* Band Exhibits 15–17.

Neither does the subsequent construction of the enactments and agreements nor the subsequent treatment of the townships distinguish this case from the Red Lake land cessions. The Band's argument that the agreement ceding the four northeastern townships to the United States was conditional is not supported by the subsequent treatment nor history of those townships. No allotments of land in severalty to Indians were ever made in the four northeastern townships as they were on the other thirty-two townships comprising the Reservation. *See Clark* Stipulation ¶ 37. Annual Reports of the Department of the Interior indicate that federal government involvement with the four townships on behalf of the Indians was directed to carrying out the terms of the Nelson Act and cession agreement. *See, e. g.,* House Exec.Doc. No. 5, 56th Cong., 2d Sess., LV–LVII (1900), Intervening Counties Exhibit CX–26; House Exec.Doc. No. 5, 58th Cong., 2d Sess., 296–

97 (1903), Intervening Counties Exhibit CX–30.

■ Accordingly, we conclude that the language of the Nelson Act and the agreement ceding the four northeastern townships to the United States was "precisely suited" to diminish the White Earth Reservation as established by the Treaty of 1867, see *DeCoteau*, 420 U.S. at 445, 95 S.Ct. at 1093, and that the legislative history, surrounding circumstances, and subsequent history clearly indicate that the four northeastern townships of the original reservation are no longer part of the White Earth Reservation.

II. Tribal Jurisdiction Over Hunting, Fishing, and Wild Rice Gathering on Indian Trust Lands.

The Band has conceded that the decision of the United States Supreme Court in *United States v. Montana*, —— U.S. ——, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (hereinafter "*Montana*") controls disposition of the issue of Band jurisdiction over nonmember hunting, fishing, and wild rice gathering on non-Indian owned fee lands within the reservation. Left for our consideration is the issue of Band authority over these activities by non-members of the Band[3] on lands owned by or held in trust for the Band or its individual members. It is also necessary to determine the nature and extent of state jurisdiction over hunting, fishing and wild rice gathering activities of non-members on Indian-owned and trust lands.[4]

■ It is difficult to specify the exact quantity of land owned by or held in trust by the Band and its members. It is safe to say that it is a small percentage of the total Reservation. See *Clark* Stipulation ¶¶ 17, 30–32. Currently, of the 709,500 acres originally held in trust for the Band in the thirty-two townships, 653,500 acres (92 percent) are not in trust status. In the four northeastern townships, no allotments were ever made. Some of the ceded lands in the four northeastern townships have been restored to trust status. A rice reserve has been established on these lands.

*State v. Clark*, 282 N.W.2d 902 (Minn. 1979), established that the Band has the right to hunt and fish free of state regulation on all reservation lands. These are aboriginal rights relinquished by the Treaty of 1855, but later reacquired by the Treaties of 1864 and 1867. *Id.* at 908. The Minnesota Court also recognized that these rights are a basic incident of reservation status. *Id.* at 909. These same principles apply to the rights of the Indians to gather wild rice. See *id.* at 909, n. 19; *Mescalero Apache Tribe v. State of New Mexico*, 630 F.2d 724, 729 (10th Cir. 1980); *United States v. Finch*, 548 F.2d 822, 832 (9th Cir. 1976), *vacated on other grounds*, 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977).

■ It is also true that the Band may condition or prohibit entry by non-members on Indian-owned and trust lands for the purpose of hunting, fishing and rice gathering by requiring compliance with permit requirements, seasons, limits, and rules regarding means of taking game, fish, and rice. This authority of the Band over non-members is grounded upon 18 U.S.C. § 1165,[5] its inherent right to exclude non-

---

**3.** We use the term "non-member" rather than "non-Indian." Indians who are not members of the Band stand on the same footing as non-Indians with regard to hunting, fishing, and wild rice gathering on the Reservation. See *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 160, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980); *Mescalero Apache Tribe v. State of New Mexico*, 630 F.2d 724, 726, n.1 (10th Cir. 1980).

**4.** We reject the Band's argument that we should decline to decide the narrower issues presented here pertaining to Indian-owned and

trust lands, and should await a more clearly defined controversy. This litigation is now seven years old; the interested parties are before the court; and both the Band and the State defendants have expressed a policy and intent to exercise regulatory authority over non-Indian hunting, fishing, and wild rice gathering on Indian-owned and trust lands. The issues are squarely before this court; it is appropriate to render a decision.

**5.** 18 U.S.C. § 1165 provides,
 Whoever, without lawful authority or permission, willfully and knowingly goes upon any

members from its lands, *see Wiliams v. Lee,* 358 U.S. 217, 219, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959), and the Band's power to govern itself as granted by its Constitution. *See Revised Constitution and Bylaws of the Minnesota Chippewa Tribe, Alexander Band Exhibit 37; United States v. Montana,* —— U.S. at ——, 101 S.Ct. at 1254, 67 L.Ed.2d 493 *aff'g in part,* 604 F.2d 1162, 1165–66 (9th Cir. 1979); *Quechan Tribe of Indians v. Rowe,* 531 F.2d 408, 410–11 (9th Cir. 1976); *People of the State of California v. Quechan Tribe of Indians,* 424 F.Supp. 969, 974 (S.D.Cal.1977), *vacated on other grounds,* 595 F.2d 1153 (9th Cir. 1979).

 In exercising its authority to condition or refuse entry on Indian-owned and trust lands for the purpose of hunting, fishing and gathering, the Band may not assert criminal jurisdiction over non-members who violate conditions of entry on Indian-owned and trust lands. *See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). The Band's authority to regulate or prohibit these activities does not extend to application of the *Conservation Code of the White Earth Indian Reservation* to non-members by arrest of non-member violators, tribal court proceedings against non-members, imposition of fines, or forfeitures. *See Clark* Defendants' Exhibit 30.

In *Quechan Tribe of Indians v. Rowe,* 531 F.2d 408 (9th Cir. 1976), the court prescribed the limits of the Tribe's authority in regulating non-member hunting and fishing:

> These are the rights to determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; to expel those who enter the reservation without proper authority or those who violate tribal, state or federal law; to refer those who violate state or federal laws to state or federal officials; and to designate officials responsible for effectuating the foregoing.

*Id.* at 411. Moreover, the court held that forfeiture proceedings were quasi-criminal in nature, and thus the Tribe could not cause any non-member to forfeit property as a consequence of violating tribal law. *Id., citing, One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965).

In the *Montana* case, the Ninth Circuit held that the Crow Tribe had the authority to regulate hunting and fishing on the reservation within constraints of the *Quechan* decision, 604 F.2d at 1165. Insofar as the holding applied to land owned or held in trust for the Tribe, the Supreme Court readily endorsed it. *See United States v. Montana,* —— U.S. at ——, 101 S.Ct. at 1254.

 Accordingly, we hold that, as to Indian-owned and trust lands within the White Earth Reservation, the Band may prohibit or condition entry by issuing and charging a fee for permits, setting limits and seasons, and prescribing permissible means of taking fish and game. We also hold that the Band may not proceed against non-members in tribal court, it may not arrest or search non-members, nor may it impose fines on non-members for violations of the Conservation Code. We hold that the Band's recourse for violations of conditions of entry by non-members is limited to suspension or revocation of permits and licenses, eviction of persons violating the Code from Indian-owned and trust lands and referral of violators to federal authorities for prosecution under 18 U.S.C. § 1165.

III. State Authority to Enforce State Game and Fish Laws on Indian Owned and Trust Lands.

The Band has instituted a rather extensive conservation program. The Band has

---

land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping or fishing thereon, or for removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish and peltries in his possession shall be forfeited.

four full-time conservation officers, two conservation officer trainees, four conservation officer cadets, one full-time fish biologist, four staff persons to assist the fish biologist and a seven member ricing committee. In addition, the Minnesota Chippewa Tribe employs a water quality expert who is available to the Band, and the Band receives assistance from a Bureau of Indian Affairs Project Supervisor, and technical assistance from the United States Fish and Wildlife Service of the United States Department of the Interior, and the University of Minnesota Water Analysis facilities.

The State of Minnesota has a policy of enforcing Minnesota game and fish laws against non-Indians on all lands within the White Earth Reservation. *Clark* Stipulation ¶ 43. The State does not, however, claim that it otherwise actively manages wildlife resources on Indian-owned or trust lands.

The issue of state authority over non-member activities on trust lands requires a "particularized inquiry into the nature of State, Federal, and tribal interests at stake, and inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980) (hereinafter *"Bracker"*). This inquiry is guided by consideration of whether the state exercise of authority has been preempted by federal law, and whether the exercise of state authority may unlawfully infringe on the right of the Band to make its own laws and be ruled by them, *Bracker*, 448 U.S. at 142, 100 S.Ct. at 2583. Either of these standards standing alone are sufficient to make state law inapplicable on Indian land. *Id.* Congressional expressions of intent with regard to self government must be read against the "backdrop" of deeply held traditional notions of Indian self government. *Id., quoting, McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973).

Indian tribes retain attributes of sovereignty over both their members and their territory. *Bracker*, 448 U.S. at 142, 100 S.Ct. at 2583. It is because of the "unique historical origins or [sic] tribal sovereignty" that different principles apply in analyzing the preemption of state law on Indian lands. *Id.* It is difficult to conceive of a subject matter in which the Indian tribes would have a stronger traditional interest than in hunting, fishing, and food gathering. *See United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). In this instance, it has already been established for the purposes of this litigation that the Band has aboriginal rights, reestablished by treaty to engage in these activities. *See Clark*, 282 N.W.2d at 909.

There is also a "significant geographical component" of tribal sovereignty which has been deemed by the Supreme Court to be "highly relevant" to any preemption analysis. *Bracker*, 448 U.S. at 149, 100 S.Ct. at 2587. In this case, this factor weighs in favor of the Band, given the Indian ownership or trust status of the lands in question.

The federal government has expressed a policy of encouraging tribal self government and economic development and self sufficiency. *See* Indian Reorganization Act of 1934, 48 Stat. 987, 25 U.S.C. § 476; Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 *et seq.* In this instance, the Band also receives assistance from both the Bureau of Indian Affairs and the Fish and Wildlife Service of the Department of the Interior in administering its comprehensive program of conservation management and regulation. It is noteworthy, however, that the United States has never taken the position in this lawsuit that state law has been preempted with regard to non-Indian hunting and fishing anywhere within the Reservation. Nor do we find any direct evidence of a federal intent to preempt state hunting and fishing laws in any federal statute or the applicable treaties. Nor is this a case where federal involvement in Indian conservation efforts points to a federal intention to preempt the State from any authority. *Compare Bracker*, 448 U.S. at 144–147, 100 S.Ct. at 2584–85.

We now examine the State's interest in applying its game and fish laws to non-members on Indian-owned and trust lands. While the State has historically been extensively involved in fish and wildlife management and regulation within the White Earth Reservation, the State does not assert that it provides such services on Indian-owned and trust lands. Given the checkerboard nature of the distribution of trust and Indian-owned lands within the Reservation, and the relatively small amount of Indian-owned and trust lands, the State's interests in uniform wildlife management are not solely limited to those lands on which it has directly exercised this function. The Indian-owned and trust lands, not the subject of Band conservation efforts until relatively recently, have undoubtedly benefited from the State's efforts in this area.

We conclude that the State has a stronger interest in this instance in the regulation of hunting, fishing, and wild rice gathering by non-members on the Indian-owned and trust lands. Although it is clear that the right of the Band to hunt and fish and gather rice is an attribute of their inherent sovereignty, that sovereignty serves only as a backdrop in determining whether federal law has preempted the application of state law in this instance. *See Bracker*, 448 U.S. at 140, 100 S.Ct. at 2582. We find no such federal expression of an intent to preempt in this instance.

We must still consider the second prong of the *Bracker* test: whether the exercise of state authority may unlawfully infringe on the right of the Band to make its own laws and be governed by them. *Id.* Dual regulatory systems, as opposed to dual systems of taxation, will always be in conflict to some extent. *See Mescalero Apache Tribe v. State of New Mexico*, 630 F.2d at 730. The inquiry must focus on whether the conflicts infringe on the Band's right to govern itself.

There are conflicts between the State and Band regulatory schemes.[6] But to the extent that conditions set on hunting, fishing, and rice gathering by non-members are more stringent than those imposed by State law, the provisions of 18 U.S.C. § 1165 mandate that these conditions may be imposed on non-members.

With this qualification, we discern no impingement on the right of the Band to govern its members and its internal relations by a State exercise of authority over non-member hunting and fishing. We are not persuaded that the imposition of a dual license requirement on non-members would result in any economic hardship to the Band because of non-member reluctance to utilize Indian-owned and trust resources. The record does not support any such conclusion. In view of the geographic distribution of Indian-owned and trust lands in this instance, the likelihood is greater that a non-member would purchase a tribal permit to protect himself from the possibility of inadvertently hunting or fishing on the Indian-owned and trust lands without the required permit. It is also likely that, given the vast resources in Minnesota for hunting and fishing, many non-members choosing to hunt or fish on Indian-owned land would have a Minnesota license in any case. Nor is there any evidence that the enforcement of State fish and game laws against non-members would disrupt the conservation efforts of the Band.

After carefully considering the interests of the federal government, the Band, and the State, we conclude that there is no federal intent to preempt the exercise of State authority over non-member hunting, fishing, and rice gathering on Indian-owned and trust lands, nor will the exercise of State authority infringe on the Band's right of self-government.

Accordingly, we declare that: 1) The White Earth Band of Chippewa Indians

6. *Compare Conservation Code of the White Earth Indian Reservation, Clark* Defendants' Exhibit 30 *with Minn.Stat.*Ch. 97, 98. An example of clear conflict between the two regulatory schemes is the Band's provision that no person shall be required to possess a Minnesota fishing or hunting license while engaging in these activities on the Reservation. *See Conservation Code, supra* at §§ 22.05, 32.03.

is entitled to hunt, fish, and gather wild rice on the White Earth Reservation without interference from or regulation by the State of Minnesota; 2) the White Earth Reservation, as established by the Treaty of 1867, was diminished by the cession of the four northeastern townships of the White Earth Reservation by an agreement between the White Earth Band and the United States dated July 20, 1889; 3) the White Earth Band has the statutory right to condition entry by non-members of the Band for the purposes of hunting, fishing and wild rice gathering on lands owned by the Band and its individual members and lands held in trust for the Band or its members by the United States. The State of Minnesota is permanently enjoined from enforcing its game and fish laws on the White Earth Reservation against members of the White Earth Band. The Band's request that the State of Minnesota be permanently enjoined from enforcing its game and fish laws against non-members of the Band anywhere within the White Earth Reservation is DENIED.