STATE of Minnesota, Respondent,

v.

Leonard E. BUTCHER, Appellant.

No. C5–96–1076.

Court of Appeals of Minnesota.

May 27, 1997.

Review Denied Aug. 5, 1997.

---

Hubert H. Humphrey III, State Attorney General, Thomas E. Bailey, Assistant Attorney General, St. Paul, for respondent.

Kip O. Fontaine, Clearwater County Attorney, Bagley, for respondent.

John M. Stuart, Minnesota State Public Defender, Steven T. Zobbi, Special Assistant State Public Defender, Minneapolis, for appellant.

Considered and decided by WILLIS, P.J., and RANDALL and KLAPHAKE, JJ.

## OPINION

RANDALL, Judge.

Appellant Leonard E. Butcher, an enrolled member of the White Earth Band of Chippewa, was charged by complaint in Clearwater County District Court with: (1) driving after cancellation in violation of Minn.Stat. § 171.24, subd. 5 (1996); (2) taking and possession of big game out of season in violation of Minn.Stat. § 97A.331, subd. 4 (1996); (3) obstructing legal process in violation of Minn. Stat. § 609.50, subds. 1(2), 2(2) (1996); and (4) transporting an uncased firearm in a motor vehicle in violation of Minn.Stat. § 97A.301, subd. 1(4), and Minn.Stat. § 97B.045, subd. 1(1) (1996). The charges stemmed from an incident occurring on October 24, 1994, on land ceded to the United States government by the White Earth Band in 1889. Appellant argues the incidents occurred on Indian land and therefore the state had no jurisdiction to enforce its laws or regulations over him.

Alternatively, appellant argues that even if the state did have jurisdiction over him, the trial court erred in imposing separate sentences for his convictions for driving after cancellation, transporting an uncased firearm, and taking deer out of season because they arose from a single behavioral incident. We affirm.

## FACTS

In the early morning of October 23, 1994, Minnesota Conservation Officer Gregory Spaulding was driving south on County Road 39 in Clearwater County. This area borders the White Earth Indian Reservation. The White Earth Reservation deer season had opened the day before. The State of Minnesota deer season opener was still two weeks away. Spaulding is responsible, in part, for patrolling on the reservation to see that

hunters who were not members of the White Earth Band did not attempt to take any deer on the reservation. Spaulding was also to see that neither band nor non-band hunters attempted to take any deer off-reservation before the opening of Minnesota's deer season.

Spaulding testified that as he was driving south on County Road 39, he passed a slow-moving blue station wagon that was traveling north. Spaulding observed that the driver of the vehicle and his two passengers were wearing red and orange clothing typical of deer hunters. The men appeared to be looking in the ditches along the side of the road, leading Spaulding to conclude the men were probably looking for deer.

Once the station wagon passed, Spaulding pulled off onto a side road and continued to observe the station wagon. Spaulding watched the station wagon stop and sit on the side of County Road 39 for a while, back up, stop and sit again, and then turn around, heading south on County Road 39. When the station wagon passed by in front of him, Spaulding pulled out and followed it south on County Road 39. The station wagon was traveling approximately 20 miles per hour and continued to do so for about three to four minutes. Spaulding pulled up behind the station wagon after it eventually pulled over to the side of the road.

Immediately, appellant, who was driving the station wagon, got out of the vehicle and met Spaulding halfway between the two vehicles. Although appellant began speaking to him, Spaulding walked past appellant and up to the station wagon and looked inside the vehicle. On the front seat between the driver and passenger seats, Spaulding observed an uncased Savage .308 rifle. The loaded .308 clip was laying next to the rifle. Spaulding reached into the vehicle and took the rifle, informing appellant that the rifle was illegal because it was uncased. Appellant responded by saying that they were on tribal land and that Spaulding could not take his rifle and that Spaulding had no right to be there.

Spaulding returned to his vehicle with the rifle, checking the rifle's action to make sure the rifle was not loaded. Appellant then

grabbed Spaulding by the arm and tried to take the rifle away. A brief struggle ensued, during which appellant yelled that Spaulding was not going to take his rifle. Spaulding worked his way free and returned to his vehicle. Spaulding tossed the rifle into his vehicle and turned to face appellant, who along with his brother, had come to within a couple of feet of Spaulding. Appellant's fists were clenched and he continued yelling at Spaulding. Fearing what might happen, Spaulding reached for his mace. Appellant and his brother backed off. Spaulding returned to his vehicle and radioed the Clearwater County Sheriff's department for assistance.

Undersheriff Lyle Colligan and Deputy Mike Erickson soon arrived at the scene. Also, John Stone, a reservation game warden, arrived later, following appellant's request that a White Earth conservation agent be present. Appellant told the gathered officers that he was hunting for deer. He admitted to driving without a driver's license, acknowledged that he knew his driver's license had been cancelled, and acknowledged that he knew his rifle was uncased while laying on the seat of his car. Appellant claims that his actions were all legal because they had occurred on "reservation land."

After consulting with Stone about the reservation boundaries, and confirming that appellant was not on the White Earth Reservation, but was on previously ceded territory, Spaulding told appellant that he would be charged for the various offenses he admitted committing. Spaulding was unable to ticket appellant at the scene because the state's law enforcement computer system was down, but he explained that the county attorney would mail appellant the necessary paperwork.

Later, on November 8, 1994, appellant was charged with: (1) driving after cancellation, (2) taking and possessing big game out of season, (3) obstructing legal process, and (4) transporting an uncased firearm. Prior to trial, appellant sought to dismiss the charges against him, arguing that the White Earth Band still retained hunting, fishing, and gathering rights on the four ceded townships and that the trial court had no jurisdiction to enforce the state's laws or regulations over

him. The trial court denied appellant's motion.

A jury trial was commenced on January 16, 1996. During trial, appellant testified that he had treaty rights to hunt on the reservation, the ceded reservation land, and anywhere else he chose to hunt; that he was not hunting as he drove down County Road 39, but that had he seen a deer he probably would have taken it; that his rifle was not cased while he was transporting it; and finally, appellant stipulated that he drove that day knowing his driver's license had been cancelled. Appellant denied grabbing Spaulding, claiming that as he went for the rifle Spaulding spun away before appellant could touch him.

After deliberating approximately one hour, the jury returned guilty verdicts on all counts. This appeal follows.

## ISSUES

1. Whether the trial court has subject matter jurisdiction to enforce the state's criminal, motor vehicle, and game and fish laws over lands ceded to the United States government by the White Earth Band of Chippewa in 1889.

2. Whether the trial court erred in imposing separate sentences for three of appellant's four convictions in violation of Minn.Stat. § 609.035 (1996), which prohibits multiple sentences for offenses arising out of a single behavioral incident.

## ANALYSIS

### I.

The central issue in this appeal is whether the State of Minnesota has jurisdiction to enforce its criminal, motor vehicle, and game and fish laws within the four townships ceded by the White Earth Band of Chippewa to the United States in 1889. Appellant argues that all four of his convictions should be reversed because the 1889 cession agreement did not extinguish the White Earth Band's right to hunt, fish, and gather in the four ceded townships (land and rights to the

townships were originally acquired by the Treaty of 1867). Respondent argues that the state has jurisdiction with regard to appellant's convictions for driving after cancellation and obstructing legal process because those alleged crimes happened off the reservation; and respondent argues further that there is no basis upon which to conclude the White Earth Band retained any hunting, fishing, and gathering rights in the ceded townships following the 1889 cession agreement.

## II.

"The White Earth Band of Chippewa Indians is one of six Chippewa bands comprising the Minnesota Chippewa Tribe." *White Earth Band of Chippewa v. Alexander,* 518 F.Supp. 527, 531 (D.Minn.1981) (*Alexander I*), *aff'd,* 683 F.2d 1129 (8th Cir.1982) (*Alexander II*). By the Treaty of 1867, the White Earth Reservation was established, consisting of 36 townships of land in square form comprising townships 141 through 146 North, Ranges 37 through 42 West, 5th Principal Meridian. *Alexander I,* 518 F.Supp. at 531. On July 20, 1889, the four northeastern townships (Townships 146, 145, 144, and 143 North of Range 37 West) of the original thirty-six were ceded by the Band to the United States pursuant to the Nelson Act. *Id.* "The agreement provided that the band did 'grant, cede, relinquish and convey to the United States all * * * [their] * * * right, title and interest * * *' in those townships." *Id.* Following the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U.S.C. § 476, approximately 2,900 acres of the 92,000 total acres in the ceded territory were returned to trust status. *Id.*

The Nelson Act was enacted in 1889 and "was designed to concentrate Minnesota's Chippewa Indian population (except the Red Lake Band) on the White Earth Reservation and open up the other Chippewa reservations to white settlement." *State v. Clark,* 282 N.W.2d 902, 905 (Minn.1979) (footnote and citation omitted). The Act called for the establishment of a commission (known as the Rice Commission) to negotiate with the Chippewa,

for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians * * * except the White Earth and Red Lake Reservations * * *.

*Id.* (footnote omitted).

By letter dated May 24, 1889, the Rice Commission was instructed by the Commissioner of Indian Affairs to determine definitively the boundaries of any land ceded on the White Earth Reservation,

so that the Indians interested therein may be able to act intelligently and with a thorough knowledge as to just what and how much land they are parting with by cession and relinquishment to the United States, and in order that the deed of acceptance, cession and relinquishment may describe the cession in a manner that cannot be mistaken or misunderstood.

*Alexander I,* 518 F.Supp. at 532 (quoting from Letter from Commissioner of Indian Affairs to Commissioners, May 24, 1889). Cession and relinquishment were to be complete upon approval of two-thirds of the male Indians of the White Earth Reservation. That occurred on July 29, 1889. *Id.*

## III.

■ Initially, we conclude appellant has waived the issue of whether the State of Minnesota has jurisdiction to enforce its criminal and motor vehicle laws within the four ceded townships. In his brief, appellant fails to make and develop any argument, other than a general statement that his convictions should be reversed because his convictions for driving after cancellation and obstructing legal process are somehow in error. Instead, he focuses solely on the issue of whether the state may enforce its game and fish laws within the ceded townships. Where a defendant asserts error, but fails to address the error in his appellate brief, the issue is deemed waived. *Scruggs v. State,* 484 N.W.2d 21, 25 n. 1 (Minn.1992) (holding that where defendant's appellate brief does not address issues raised in petition for postconviction relief, those issues are deemed waived). Consequently, issues concerning appellant's conviction for obstructing legal process and driving after cancellation are

deemed waived. Those convictions are affirmed.

■ However, even if these issues were properly before this court, we conclude the state did have jurisdiction to charge appellant with driving after cancellation and obstructing legal process. Appellant concedes that the offenses took place within the four townships ceded by the White Earth Band in 1889 and not on the White Earth Reservation proper. In *Alexander I*, the federal district court specifically ruled that White Earth Reservation, as established by the Treaty of 1867, "was diminished by the cession of the four northeastern townships of the White Earth Reservation by an agreement between the White Earth Band and the United States dated July 20, 1889." 518 F.Supp. at 538. The four ceded townships are no longer considered part of the White Earth Reservation. The offenses for which appellant was charged occurred, therefore, "off-reservation." The state has the authority to enforce its laws in a nondiscriminatory fashion against Indians off the reservation. *Bailey v. State,* 409 N.W.2d 33, 34 (Minn.App.1987); *see also Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973) (holding that, absent express federal law to the contrary, Indians outside of the reservation boundaries are subject to nondiscriminatory state law otherwise applicable to all citizens of the State).

Thus, because the criminal offenses were committed off the White Earth Reservation and because there is no federal law to the contrary, the State of Minnesota has jurisdiction to charge appellant with obstructing legal process and driving after cancellation.

## IV.

■ The principal issue raised by appellant is whether the White Earth Band of Chippewa retained any hunting, fishing, and gathering rights in the 1889 ceded townships. Appellant argues that he was exercising his right to hunt, fish, and gather as recognized by the Treaty of 1867 and that such rights were not extinguished when the four townships were ceded in 1889. Appellant claims that the 1889 ceded lands are in the same legal status as the current White Earth Reservation; that is, they are part of "Indian Country," as defined by 18 U.S.C.A. § 1151(a).

The issue of whether these ceded townships share the same legal status as the White Earth Reservation has already been litigated and dealt with in great length in *Alexander I* and *Alexander II.*

In *Alexander I,* the White Earth Band brought suit in federal district court seeking declaratory relief to determine the extent of the Band's rights to hunt, fish, and gather on the White Earth Reservation without regulation or licensing by the State of Minnesota. 518 F.Supp. at 530. The court was specifically asked to address the issue of whether the White Earth Reservation includes the four northeastern townships ceded to the United States in 1889. *Id.* at 531. The court concluded that these townships did not constitute part of the White Earth Reservation. *Id.* at 534.

In reaching its conclusion, the court was required to and did make extensive findings regarding the legislative intent behind the Nelson Act of 1889, the purpose of the Rice Commission, the negotiations between the Chippewa and the Rice Commission, and the contemporary understanding of the Indians with regard to what rights and interest in the ceded townships the Indians believed they were giving up. The court concluded

that the language of the Nelson Act and the agreement ceding the four northeastern townships to the United States was "precisely suited" to diminish the White Earth Reservation as established by the Treaty of 1867 * * * and that the legislative history, surrounding circumstances, and subsequent history clearly indicate that the four northeastern townships of the original reservation are no longer part of the White Earth Reservation.

*Id.* (citation omitted).

The *Alexander I* court found that "the express language of the Nelson Act and its legislative history reveal a clear congressional intent to extinguish all property rights in the ceded lands." *Id.* at 532. The court also found that the transcripts of the negotiations between the Band and the Rice Commission

clearly reflect that the proposed cession of the four townships was fully considered by the Indians, and that it was understood that the reservation would be diminished by cession of those lands.

*Id.* (citing to Transcript of Council at White Earth, July 17–29, 1880, House Exec. Doc. No. 247, 51st Cong. 1st Sess., 85–116 (1890)).

The *Alexander I* court permanently enjoined the State of Minnesota from enforcing its game and fish laws on the White Earth Reservation against members of the White Earth Band. *Id.* at 538. The court specifically held that while the White Earth Band had the statutory right to condition entry of nonmembers of the Band for the purposes of hunting, fishing, and gathering on lands owned by the Band or held in trust for the Band by the United States, the four ceded townships were no longer part of the White Earth Reservation. *Id.* at 534. Necessarily then, the court held that the State of Minnesota had the authority to enforce its game and fish laws within the ceded townships. The four townships are no longer part of the White Earth Reservation.

In affirming the district court, the Eighth Circuit Court of Appeals held that the four northeastern townships were not restored to reservation status by the Indian Reorganization Act of 1934. *Alexander II*, 683 F.2d at 1136. The court stated that:

Gaming rights are tied to the status of the four townships. If the four townships were ceded and never returned to reservation status, no Indian hunting and fishing rights exist within the four townships.

*Id.* at 1135. After concluding that the four townships had not been restored to reservation status, the Eighth Circuit affirmed the district court's ruling that the White Earth Band retained no hunting, fishing, or gathering rights within the four ceded townships. *Id.* at 1136.

In *Clark*, the Minnesota Supreme Court held that the State of Minnesota was without jurisdiction to regulate the White Earth Band's right to hunt, fish, and gather within the White Earth Reservation, as established by the Treaty of 1867. 282 N.W.2d at 909. However, the court, recognizing the 1889 cession of the four northeastern townships, spe-cifically limited its holding "to land lying within the 32 townships of the White Earth Indian Reservation remaining after the 1889 cession." *Id.* at 906 n. 13. Thus, just like the courts in *Alexander I & II*, the Minnesota Supreme Court stated that the White Earth Band did not retain hunting, fishing, or gathering rights within the four ceded townships.

Similarly, in *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn.1979), *aff'd*, *Red Lake Band of Chippewa Indians v. Minnesota*, 614 F.2d 1161 (8th Cir.1980), *cert. denied*, 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980), found controlling by the court in *Alexander I*, the federal district court was asked to consider whether the Red Lake Band relinquished all their right, title, and interest in lands ceded to the United States in 1889 and 1904, including the right to hunt, fish, and gather. 466 F.Supp. at 1383. The 1889 cession involving the Red Lake Band was made pursuant to the Nelson Act and used language identical to that found in the cession agreement between the White Earth Band and the United States. The *Red Lake* court held that the Red Lake Band did not retain hunting, fishing, trapping, or wild ricing rights in the areas ceded in 1889. *Id.* at 1389.

In reaching this conclusion, the court noted that:

If the cession extinguished Indian title to the ceded areas, they also would have the effect of abrogating any aboriginal hunting, fishing, trapping, or wild ricing rights. These rights are mere incidents of Indian title, not rights separate from Indian title, and consequently if Indian title is extinguished so also would these aboriginal rights be extinguished.

*Id.* at 1385 (citation omitted). The court also found that "the negotiations with the Red Lake Band in 1889 contain no mention of reserved [hunting, fishing, or gathering] rights, stating instead that the purpose of the negotiations was to effect the sale of land not being used by the Indians." *Id.* at 1387 (citation omitted).

Appellant argues that the decisions of *Alexander I*, *Alexander II*, *Red Lake*, and *Clark* are suspect because they "incorrectly

interpret the law" governing the interpretation of cession agreements with Indian tribes. Appellant argues that the above decisions are eroded by the decisions in *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341 (7th Cir.1983), and *Mille Lacs Band of Chippewa Indians v. Minnesota,* 861 F.Supp. 784 (D.Minn.1994). We disagree.

■■■ As respondent notes, the results reached by the courts in *Alexander I & II* are not inconsistent with the holdings in *Voigt* and *Mille Lacs.* The different results stem not from an erroneous application of the law governing the interpretation of cession agreements, but rather from factual differences in the record. Each case was decided on its own specific set of facts after applying the special rules of construction applicable to interpreting treaties and agreements between Indians and the government. These rules require: (1) that treaties be construed not according to the technical meaning of the words, but rather as the Indians understood them; (2) that any ambiguous terms be resolved in favor of the Indians, and (3) that the history of the treaty, the negotiations, and the practical construction of the treaty by the parties all be considered when interpreting an Indian treaty. *See Voigt,* 700 F.2d at 350–51 (citations omitted). These same principles apply when construing an act of Congress that purports to extinguish treaty rights of the Indians. *Id.* at 351.

In *Voigt,* the court held that the 1854 treaty between the Lac Courte Oreilles (LCO) Band and the United States ceding land to government in return for a reservation did not extinguish the band's hunting, fishing, and gathering rights on the ceded land. *Voigt,* 700 F.2d at 364. The court found that under the circumstances, the LCO Band did not understand that the Treaty of 1854 abrogated their treaty-recognized usufructuary rights and the Government did not intend to extinguish such rights. *Id.* Likewise, in *Mille Lacs,* the district court ruled that an 1855 treaty ceding land to the government did not extinguish the band's usufructuary privileges granted by an 1837 treaty. The court found that "the Chippewa did not intend to give up their 1837 treaty privi-

lege [to hunt, fish, and gather] and they did not understand the 1855 treaty to have that effect." *Mille Lacs,* 861 F.Supp. at 818. The court also found that based on a careful examination of the historical record, the practical construction of the 1855 treaty by the parties to it indicated that the parties intended that the 1837 usufructuary privilege would continue to exist. *Id.*

In the present case, appellant failed to present any evidence to the trial court showing that the historical record developed by the state and the White Earth Band in *Clark* and *Alexander I & II* was inadequate or inaccurate on the issue of whether the Band understood that it retained no hunting, fishing, or gathering rights within the ceded townships. Appellant simply argues the trial court should have drawn a different conclusion from the historical record established in *Clark* and *Alexander I & II* because other courts in other cases have reached different results. Appellant's argument ignores the fact that each court was confronted with different historical and factual records.

■■■ In sum, the decisions in *Clark* and *Alexander I & II* make clear that the four ceded townships are no longer part of the White Earth Reservation as established by the Treaty of 1867. The historical record developed by the White Earth Band in those cases shows that the Band understood that they would no longer retain any hunting, fishing, or gathering rights in the four ceded townships. Consequently, the trial court properly applied the law when it concluded that it had subject matter jurisdiction over appellant and that the State of Minnesota had authority to enforce its game and fish laws within the four ceded townships.

## V.

■■■ Appellant argues that even if the trial court had jurisdiction over him, the trial court erred when it imposed separate sentences for his convictions for driving after cancellation, taking big game out of season, and transporting an uncased firearm because these offenses arose out of a single behavioral incident. We disagree.

Minn.Stat. § 609.035, subd. 1 (1996), provides, in part, that "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses." Whether multiple offenses arise from a single behavioral incident is dependent upon the particular facts and circumstances of each case. *State v. Gilbertson*, 323 N.W.2d 810, 812 (Minn.1982). When the offenses include both intentional and unintentional crimes, it must be determined whether the offenses "[arose] out of a continuing and uninterrupted course of conduct, manifesting an indivisible state of mind or coincident errors of judgment." *State v. Gibson*, 478 N.W.2d 496, 497 (Minn.1991) (citations omitted). In other words, a reviewing court must determine whether the offenses were based on a single behavioral incident, or rather, divisible conduct. *Mercer v. State*, 290 N.W.2d 623, 626 (Minn.1980). Divisibility of conduct under Minn.Stat. § 609.035 depends on the divisibility of defendant's state of mind, not the separability of his actions. *State v. Krech*, 312 Minn. 461, 465, 252 N.W.2d 269, 272–73 (1977).

In the present case, the charged offenses were distinct and separate. Each of appellant's offenses was committed and proven independently of the others. One did not necessarily give rise to another. The charged offenses do not share an indivisible state of mind or coincidental errors in judgment. Transporting an uncased firearm is an individual offense. You can be guilty of that simply by placing the uncased firearm in any area of the vehicle where uncased firearms are not allowed (the trunks of vehicles that have trunks and the special provisions for utility or sport vehicles that do not have trunks are not at issue). The offense of taking deer out of season did not occur until appellant began to hunt along Highway 39. The offense for driving after cancellation was committed when appellant started his vehicle and began driving. *See State v. Holland*, 421 N.W.2d 382, 389 (Minn.App.1988) (accepting state's argument that driving after cancellation offense and driving with unsafe equipment violation were committed the moment defendant started car and began driving).

Simply put, the charged offenses in the present case do not manifest an indivisible state of mind or coincident errors of judgment. All three, although committed during the same time frame, were independent of each other. An examination of the entire course of appellant's conduct leads us to conclude that the trial court could properly impose separate sentences for convictions for driving after cancellation, transporting an uncased firearm, and hunting deer out of season.

## DECISION

The State of Minnesota has jurisdiction to enforce its criminal, motor vehicle, and game and fish law within the four townships ceded by the White Earth Band of Chippewa to the United States government in 1889. The federal decisions in *Alexander I & II* and the state court decision in *Clark* establish that the 1889 cessation agreement extinguished the White Earth Band's right to hunt, fish, and gather in the four ceded townships. These cases further establish that the four ceded townships are no longer part of the White Earth Reservation. The State of Minnesota has jurisdiction to enforce its laws and regulations within the four ceded townships.

Finally, because the charges for driving after cancellation, transporting an uncased firearm, and hunting deer out of season are distinct and separate events, we conclude they do not manifest an indivisible state of mind or coincident errors of judgment. Rather they are separate and independent acts. The trial court did not err in imposing separate sentences for each conviction.

**Affirmed.**