**UNITED STATES of America, Plaintiff,**

v.

**STATE OF MINNESOTA, Defendant,**

**and**

**Counties of Roseau, Pennington, Marshall, Red Lake, Polk, Clearwater, Beltrami, Lake of the Woods and Koochiching, Intervening Defendants.**

Civ. No. 6–76–465.

United States District Court,
D. Minnesota,
Sixth Division.

March 28, 1979.

States government, seeks a declaratory judgment that its members retain hunting, fishing, trapping, and wild ricing rights in an area the Band ceded to the federal government in 1889 and 1904. That area encompasses about 2.6 million acres in northwestern Minnesota adjacent to the present diminished Red Lake Reservation. The position of the Indians basically is that those rights were guaranteed them in an 1863 treaty and were not abrogated by the subsequent 1889 and 1904 land cessions. Defendant State of Minnesota and intervening defendant counties disagree. They assert that in 1889 and 1904 the Red Lake Indians expressly relinquished all their right, title, and interest in the ceded area, which of necessity must include hunting, fishing, trapping, and wild ricing rights. The parties have submitted the issue on exhibits, briefs, and oral arguments. The court concludes that the Red Lake Band did not retain hunting, fishing, trapping, or wild ricing rights in the area ceded in 1889 and 1904.

### Summary of Facts

Prior to the influx of white settlers, the Red Lake Band inhabited a large area of northwestern Minnesota encompassing about 13 million acres. In 1863, the Band, in its first significant treaty with the federal government, ceded about 10 million acres of their land to the United States. This cession, known as the 1863 Treaty at the Old Crossing of the Red Lake River, was negotiated by Alexander Ramsey. The treaty contains no mention of hunting and fishing rights, but the transcript of Ramsey's negotiations with the Band makes clear that the Indians were promised they could continue to hunt and fish on the ceded land until it was settled. *See* Journal of Proceedings Connected with the 1863 Treaty at the Old Crossing of the Red Lake River, at pp. 8, 15, 27, 37–38, 47, 54 (Plaintiff's Exhibit 53). After the 1863 Treaty at the Old Crossing, the Red Lake Reservation consisted of about 3.2 million acres. It is in this area, not the entire original 13 million

Andrew W. Danielson, U. S. Atty., Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., for plaintiff.

Warren Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., and James M. Schoessler, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendant.

Tom D. Tobin, Winner, S. D., and David A. Mustone, Tobin & Covey, Washington, D. C., for intervening defendants.

Rodney J. Edwards, Edwards, Edwards & Bodin, Duluth, Minn., amici curiae for Red Lake Band.

### MEMORANDUM AND ORDER

DEVITT, Chief Judge.

### Introduction

The Red Lake Band of Minnesota Chippewa Indians, represented by the United

acres, that the Band now claims it has retained hunting, fishing, trapping, and wild ricing rights.

The second land cession by the Red Lake Band occurred in 1889. In that year Congress passed the Nelson Act, which authorized negotiations for the purchase of land from the Red Lake Band. A three member commission, which became known as the Rice Commission, was appointed to conduct negotiations. The commission was instructed by Congress to obtain an agreement with the Band "for the cession and relinquishment in writing of all their title and interest in and to" the lands the Band agreed to sell. Any such agreement, upon approval of the President, was to "operate as a complete extinguishment of the Indian title" to the ceded land. See Nelson Act of January 14, 1889, c. 24, 25 Stat. 642 (Amicus' Exhibit M). Pursuant to the Nelson Act the Rice Commission negotiated an agreement with the Red Lake Band for the cession of about 2.4 million acres of the Band's land. In that agreement the Band agreed to "grant, cede, relinquish, and convey to the United States all our right, title, and interest in and to all" of the 2.4 million ceded acres. Neither the Nelson Act, the agreement, nor the transcript of the negotiations contain any reference to reserved hunting, fishing, trapping, or wild ricing rights in the ceded area.

The final land cession by the Red Lake Band occurred in 1904. Congress authorized negotiations by the Act of March 3, 1901, 31 Stat. 1077, and Inspector James McLaughlin negotiated an agreement with the Band in 1902. The agreement contained language of conveyance similar to the Nelson Act, and, like in the Nelson Act, no mention was made of reserved hunting, fishing, trapping, or wild ricing rights. The agreement was not ratified by Congress because of disagreement over method of payment, but Congress in 1904 did consummate the cession on terms substantially identical to the 1902 agreement, except for method of payment. See Act of Feb. 20, 1904, 33 Stat. 46. As a result, the size of the Red Lake Reservation was reduced to about 543,000 acres. The reservation was increased to its present size when approximately 160,000 acres were restored to tribal ownership pursuant to the 1934 Indian Reorganization Act, 48 Stat. 984.

Subsequent to the 1904 cession, the State of Minnesota has consistently enforced its gaming laws against Band members who hunt and fish in the area ceded in 1889 and 1904, except for the area later restored to tribal ownership. Both the state and the federal government have taken the position, up until 1976, that Band members have no unique hunting, fishing, trapping, or wild ricing rights in the ceded area. Moreover, while Band members have often violated State gaming laws over the years in the area at issue, there is virtually no evidence that, up until commencement of this litigation, the Band seriously contended that the state had no jurisdiction over its hunting, fishing, trapping, and wild ricing activities in the ceded area.

## DISCUSSION

### Principles of Treaty Construction

■ In numerous opinions over the years the United States Supreme Court has established certain basic principles of treaty and statutory construction when Indian land cessions are at issue. The Court has recognized on many occasions that treaties and agreements with the Indians cannot be considered as exercises in ordinary conveyancing, because of the dependent status of the Indians and the nonconsensual nature of the cessions. Rather, cession treaties and agreements must be interpreted as the Indians understood them, and doubtful expressions must be resolved in their favor. See, e. g., Choctaw Nation v. Oklahoma, 397 U.S. 620, 630–31, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); Winters v. United States, 207 U.S. 564, 576, 28 S.Ct. 207, 52 L.Ed. 340 (1908). Similar principles apply when construing congressional enactments, such as the Nelson Act, which purportedly alter property rights of Indians. The Supreme Court has ruled that Congressional intent to abrogate Indian property rights must be clear from the face of the Act or surround-

ing circumstances, and that doubtful expressions in the Act must be resolved in favor of the Indians. *See, e. g., DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd,* 291 U.S. 138, 160, 54 S.Ct. 361, 78 L.Ed. 695 (1934).

■ The above principles require the court to take a sympathetic view toward the position of the Red Lake Band, but those principles do not permit us to ignore the clear wording of a treaty, agreement, or enactment, or to disregard the intent of Congress. The Supreme Court has cautioned that the courts cannot remake history or expand treaties and legislation beyond their clear terms to remedy a perceived injustice suffered by the Indians. *E. g., Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Choctaw Nation v. United States,* 318 U.S. 423, 431, 63 S.Ct. 672, 87 L.Ed. 877 (1943).

■ To determine the intent of Congress and understanding of the Indians, the court must analyze the wording of the treaties, agreements, and enactments, the prior history, the surrounding circumstances, and the subsequent construction given those documents by the parties. *See, e. g., Choctaw Nation v. United States,* 318 U.S. 423, 431, 63 S.Ct. 672, 87 L.Ed. 877 (1943).

### Wording of the Agreements and Enactments

■■ At issue here is whether the 1889 and 1904 land cessions resulted in extinguishment of all the Indians' property rights in the ceded areas, in particular the right to hunt, fish, trap, and gather wild rice. Therefore, the language used in the

enactments and agreements that resulted in those cessions must be analyzed. Each of these documents contain variations of essentially the same language, that the Band relinquishes "all its right, title, and interest in and to" the ceded area. None of the documents mention the retention of hunting, fishing, trapping, or wild ricing rights.

Two recent United States Supreme Court decisions have construed Indian cession agreements and enactments with language nearly identical to that quoted above. *See Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). These cases make clear that the "all right, title, and interest" language is "precisely suited" for the purpose of eliminating Indian title and conveying to the government all the Band's interest in the ceded lands. *DeCoteau, supra,* at 445, 95 S.Ct. 1082; *Rosebud, supra,* at 1366. In the present case, this intent is fortified by the further express language of the 1889 Nelson Act, that the cession was to "operate as complete extinguishment of the Indian title" to the land sold by the Red Lake Band.

If the cessions extinguished Indian title to the ceded areas, they also would have the effect of abrogating any aboriginal hunting, fishing, trapping, or wild ricing rights. These rights are mere incidents of Indian title, not rights separate from Indian title, and consequently if Indian title is extinguished so also would these aboriginal rights be extinguished. *Compare United States v. Klamath Indians,* 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); *see generally,* Cohen, *Original Indian Title,* 32 Minn.L. Rev. 28 (1947). Thus, the language used was "precisely suited" for relinquishment of the very rights the Band now claims it retained.[1]

---

1. The Band asserts that *DeCoteau* and *Rosebud* are not controlling, but rather that *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) mandates a different result. *Menominee,* argues the Red Lake Band, establishes a rule of construction that, for hunting and fishing rights to be relinquished, they must be specifically mentioned in

the relevant Act of Congress or agreement, or at least there must be clear evidence that Congress intended to abrogate those specific rights. Properly read, however, *Menominee* is not inconsistent with *DeCoteau, Rosebud,* or the present case. In *Menominee,* Congress terminated the reservation status of the tribe's land and conveyed the land to a corporation owned

Under defendant's and defendant intervenor's view of the case, the court's analysis should stop at this point; if Indian title to the ceded area was relinquished in 1889 and 1904, then the Band retains no hunting, fishing, trapping, or wild ricing rights in the ceded area. Analysis should not stop here, however. Extinguishment of Indian title eliminates aboriginal hunting, fishing, trapping, and wild ricing rights, but it does not necessarily preclude the possibility that similar rights were granted back to the Band in exchange for the land cessions. *See, e. g., United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). The wording of the agreements and enactments makes this possibility quite remote. We must, nonetheless, examine the prior history, surrounding circumstances, and subsequent construction by the parties to determine whether there was an understanding, not reduced to writing, that the Band members could continue permanently to hunt, fish, trap, and gather wild rice in the ceded areas.

### Prior History

The first land cession treaty with the Red Lake Band occurred in 1863. Prior to that time, however, the Chippewa Indians did enter into a number of cession treaties, although none involved the Red Lake Band specifically or the land at issue in this case. Four of these early treaties contained express provisions that reserved Indian hunting and fishing rights in areas ceded by the treaties. However, those rights normally were reserved only until when "the land is required for settlement" or "until required to remove by the President." *See* Treaty of 1854 with the Chippewa Indians of Lake Superior and the Mississippi, Act II, 10 Stat. 1109 (1854) (Amicus' Exhibit G); Treaty of 1842 with the Chippewa Indians of the Mississippi and Lake Superior, Act III, 7 Stat. 591 (1842) (Amicus' Exhibit D); Treaty of 1834 with the Chippewa Nation of Indians, Art. 5, 7 Stat. 536 (1837) (Amicus' Exhibit C); Treaty of 1836 with the Ottawa and Chippewa Nations of Indians, Art. Thirteenth, 7 Stat. 491 (1836) (Amicus' Exhibit B). Consequently, these early treaties indicate two things: first, that the normal practice was to state in the agreement if the Band was reserving hunting and fishing rights in the ceded area, and second, that when those rights were reserved it was only for a limited duration, typically until the influx of white settlers occurred.

The first land cession treaty by the Red Lake Band was the 1863 Treaty at the Old Crossing of the Red Lake River. In that treaty the Band ceded about 10 million of the approximately 13 million acres to which it held aboriginal Indian title, including most of the fertile Red River Valley. That treaty on its face did not mention hunting, fishing, trapping, or wild ricing rights. The transcript of the negotiations with the Indians makes clear, however, that the Band was told it could continue to hunt and fish as before over the ceded area. For example, Alexander Ramsey, the government negotiator, told the Band that: "If [you] sold the lands [you] could still occupy and hunt over it as heretofore, probably for a long time. It would not probably be wanted for settlement before the youngest man among [you] was a grey-headed old man." Journal of Proceedings Connected with the 1863 Treaty at the Old Crossing of the Red Lake River, at 15 (Plaintiff's Exhibit 53).

by the tribe. The Supreme Court analyzed the legislative history and surrounding circumstances of the Termination Act and concluded that Congress did not intend to abrogate the tribe's preexisting treaty hunting and fishing rights over the tribe's land. In the present case, the Congressional enactments at issue, the Nelson Act and the Act of 1904, unlike the Termination Act in *Menominee,* resulted in the sale of the Band's land to the government. The purpose of the Acts in this case were entirely different from the Termination Act—to eliminate Indian title, restore the land to the public domain, and allow for settlement by whites. Thus, following the same analysis, determining Congressional intent with doubts construed in favor of the Indians, the Court in *Menominee* could reasonably determine that the Termination Act did not abrogate hunting and fishing rights, while the court in the present case, involving an entirely different type of statute, could reasonably reach the opposite conclusion.

The Band bases much of its arguments on Ramsey's promises in 1863. While it is true that Ramsey promised the Band it could hunt and fish as before, that promise, like the express ones contained in earlier treaties, was for only a limited duration—until the land became inhabited by white settlers. More significantly, what Ramsey told the Band in 1863 is only peripherally relevant to the issues in this case. The Band is not claiming that it has rights in the 10 million acre area ceded in 1863, but only in the 3.2 million acres it retained after the 1863 treaty. Therefore, Ramsey's promises about hunting and fishing in the area ceded in 1863, while shedding some light on the Band's understanding of the effect of a land cession, do not create rights in the area subsequently ceded in 1889 and 1904. Treaties prior to 1889 therefore contain some suggestion of a practice of letting the Indians hunt and fish on ceded lands until they were settled by the whites, but the prior history provides little meaningful support for the claims now made by the Red Lake Band.

*Surrounding Circumstances and Legislative History*

The circumstances surrounding the 1889 and 1904 cessions also provide little support for the Band's position. The only significant historical evidence in favor of the Indians is a statement by a Band spokesman in 1902 concerning his recollection of what the Indians were told by the Rice Commission in 1889:

> We were given to understand that we had the use of any ceded land that was not occupied by settlers, to be used as our own. And we furthermore reserved the privilege of using that as our hunting grounds as in former years.

Transcript of Council with the Red Lake Band on March 4, 1902, *reprinted at* Hearings Before the Committee on Indian Affairs, House of Representatives, 66th Cong., 2d Sess. 201, 208 (1920). This recollection by the Band spokesman, made thirteen years after the event, is the primary hard evidence upon which the Band rests its case.

The Band's position is refuted by numerous pieces of historical evidence. The legislative history of the 1889 Nelson Act makes no mention of reserved hunting and fishing right, but rather makes clear that the purpose of the Act is to restore the land to the public domain and open it to settlement by whites. *See generally* H.R.Rep.No.789, 50th Cong., 1st Sess. (1888) (Defendant's Exhibit F). Also, Congress had just recently enacted the Dawes Act in 1887, which established a policy of encouraging Indians to abandon their nomadic ways and adopt the agrarian lifestyle of whites. *See* Act of Feb. 8, 1887, c. 119, 24 Stat. 388. This suggests that Congress in 1889 probably would not have intended to allow the Red Lake Band to continue permanently its nomadic hunting and fishing habits over the lands ceded to the federal government.

The evidence against the Band is further reinforced by the transcripts of the negotiations in 1889 and 1902. Contrary to the assertions of the Band spokesman in 1902, the negotiations with the Red Lake Band in 1889 contain no mention of reserved rights, stating instead that the purpose of the negotiations was to effect the sale of land not being used by the Indians. *See, e. g.*, Transcript of Council at Red Lake from June 29 through July 6, 1889, H.R.Exec.Doc.No.247, 51st Cong., 1st Sess., at 67, 80. Moreover, the Rice Commission, pursuant to the Nelson Act, negotiated with other Minnesota Chippewa Bands in 1889, and at least two of those Bands were told that under the Nelson Act they would not retain special hunting and fishing rights in ceded areas, but instead would be subject to state gaming laws the same as non-Indians. *Id.* at 169 (Mille Lac Band); 178 (Grand Portage Band). Finally, in 1902 Inspector McLaughlin specifically instructed the Red Lake Band that after the 1904 cession it would be subject to state gaming laws to the same extent as non-Indians. *See* Transcript of March 4, 1902 Council with the Red Lake Band, *reprinted at* Hearings Before the Committee on Indian Affairs, House of Representatives, 66th Cong., 2d Sess. 201, 226 (1920).

The surrounding circumstances, and legislative history, therefore do not provide support for the position urged by the Red Lake Band. The historical evidence with respect to the legislative history and the negotiations with the Band, if anything, tends to confirm that the enactments and agreements meant exactly what they said—the Band relinquished *"all* its right, title, and interest" to the areas ceded in 1889 and 1904.

### Subsequent Construction

The final factor to be considered is the subsequent construction that the parties have given the relevant enactments and agreements. *See DeCoteau v. District County Court,* 420 U.S. 425, 442, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). The parties concede that both the state and federal governments have consistently taken the view over the years that the Band has no greater rights in the ceded area than non-Indians. Moreover, state gaming laws have been regularly enforced against activities of Band members in the ceded areas since the cessions occurred.

### CONCLUSION

The Band's position in this case is based on scanty and inconclusive evidence. This evidence, claims the Band, is sufficient, when combined with the rules of construction favoring the Indians, to mandate a ruling in favor of the Band. The court is of the view, however, that if the rules of construction were invoked as the Band requests, we would be using those rules to remake history in derogation of the clear wording and intent of the relevant enactments and agreements. As the Supreme Court observed in *Choctaw Nation v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 87 L.Ed. 877 (1943) (citations omitted):

> Of course treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." But even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties.

We hold that the Red Lake Band does not retain hunting, fishing, trapping, or wild ricing rights in the areas ceded in 1889 and 1904. The clerk is directed to enter judgment accordingly.