683 F.2d 1129
 WHITE EARTH BAND OF CHIPPEWA INDIANS, Appellee,
v.
Joseph N. ALEXANDER, individually and as Commissioner of
Natural Resources for the State of Minnesota and Fredean C.
Hammer, Director of the Division of Enforcement and Field
Service for the Department of Natural Resources, Counties of
Mahnomen, Clearwater and Becker, Elmer H. Winter, Kenneth
Albertson, Joe Klinkhammer, Ed Grahame, Appellants.
UNITED STATES of America, Appellee,
v.
STATE OF MINNESOTA, Appellee/Cross Appellant.
WHITE EARTH BAND OF CHIPPEWA INDIANS, Appellee,
v.
Joseph N. ALEXANDER, individually and as Commissioner of
Natural Resources for the State of Minnesota and Fredean C.
Hammer, Director of the Division of Enforcement and Field
Service for the Department of Natural Resources, Counties of
Mahnomen, Clearwater and Becker, Elmer W. Winter, Kenneth
Albertson, Joe Klinkhammer, Ed Grahame, Appellants.
UNITED STATES of America, Appellee,
v.
STATE OF MINNESOTA, Appellant.
WHITE EARTH BAND OF CHIPPEWA INDIANS, Appellant,
v.
Joseph N. ALEXANDER, individually and as Commissioner of
Natural Resources for the State of Minnesota and Fredean C.
Hammer, Director of the Division of Enforcement and Field
Service for the Department of Natural Resources, Counties of
Mahnomen, Clearwater and Becker, Elmer W. Winter, Kenneth
Albertson, Joe Klinkhammer, Ed Grahame, Appellees.
UNITED STATES of America,
v.
STATE OF MINNESOTA, Appellee.
WHITE EARTH BAND OF CHIPPEWA INDIANS, Appellee,
v.
Joseph N. ALEXANDER, individually and as Commissioner of
Natural Resources for the State of Minnesota and Fredean C.
Hammer, Director of the Division of Enforcement and Field
Service for the Department of Natural Resources, Counties of
Mahnomen, Clearwater and Becker, Elmer W. Winter, Kenneth
Albertson, Joe Klinkhammer, Ed Grahame, Appellants.
 Nos. 81-1805, 81-1833, 81-1861 and 81-1862.
 United States Court of Appeals, Eighth Circuit.
 Submitted Jan. 13, 1982.
Decided May 14, 1982.
 
 Carol E. Dinkins, Asst. Atty. Gen., James M. Rosenbaum, U. S. Atty., Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., Edward J. Shawaker, Kay L. Richman, Attys., Dept. of Justice, Washington, D. C., for United States; John Jacobson, Atty., U. S. Dept. of the Interior, St. Paul, Minn., of counsel.
 Tupper, Smith & Mattson, by Kent P. Tupper, Walker, Minn., for White Earth Band of Chippewa Indians; Bernard P. Becker, St. Paul, Minn., of counsel.
 Before HENLEY, Circuit Judge, GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 This case presents appeals and cross-appeals from the district court's[1] granting of motions for issue preclusion and determination of the litigation on the merits. For partial reversal, the White Earth Band of Chippewa Indians argues that the district court erred in (1) ruling that four townships[2] had not been restored to the White Earth Reservation and (2) determining that the State of Minnesota could require "non-members"[3] hunting and fishing on Indian Lands with tribal permission to follow state limits and regulations. The state appellees, intervening counties and individual intervenors cross-appeal from the district court's order which precluded litigation of the disestablishment issue decided in State v. Clark, 282 N.W.2d 902 (Minn.1979) (Clark ), cert. denied, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980). They argue that collateral estoppel is inapplicable because (1) there has been a significant change in the law and (2) the purposes of collateral estoppel are not met. For the reasons discussed below, we affirm the judgment of the district court.
 
 
 2
 The facts underlying this appeal are not disputed. The district court thoroughly discussed the background of litigation, White Earth Band of Chippewa Indians v. Alexander, 518 F.Supp. 527 (D.Minn.1981); therefore, only facts pertinent to this appeal will be reproduced here.
 
 
 3
 The White Earth Band is one of six Chippewa Bands comprising the Minnesota Chippewa Tribe. The White Earth Reservation was established by the treaty of March 19, 1867, and consisted of thirty-six townships. 16 Stat. 719, II Kappler 974 (ratified April 8, 1867). In 1889, Congress enacted the Nelson Act, 25 Stat. 642, I Kappler 301, one of a series of particularized allotment acts adopted after passage of the Dawes Act or General Allotment Act of 1887, 24 Stat. 388, I Kappler 33. On July 20, 1889, pursuant to the Nelson Act, the Band ceded their right and title to four northeastern townships. See note 2 supra. Following the Indian Reorganization Act of 1934, 48 Stat. 987, codified at 25 U.S.C. § 476, approximately 2,900 acres of the 92,000 acres of the four ceded townships were restored to trust status.
 
 
 4
 In 1974, the Band filed a complaint in federal district court against the State of Minnesota and certain state officials seeking declaratory and injunctive relief after numerous arrests of Band members for fishing and hunting violations within the White Earth Reservation. Three Minnesota counties, Becker, Clearwater and Mahnomen (counties) and four individuals were allowed to intervene. The Band sought a declaration that (1) its members and Minnesota Chippewa Tribe members were entitled to hunt, fish, trap and gather wild rice without any interference, regulation, control or licensing by officials of the Minnesota Department of Natural Resources, and (2) the Band and Tribe had jurisdiction to regulate those activities by non-members within their Reservation. The district court consolidated the action with a suit filed by the United States against the State of Minnesota seeking to prohibit the state from enforcing its hunting, fishing, trapping and wild rice gathering laws (hereinafter gaming laws) against Band members on the Reservation.
 
 
 5
 The Band's action was held in abeyance by agreement of the parties and with court approval while several issues were litigated in state court regarding prosecutions of Band members for gaming laws violations on the Reservation. These prosecutions were consolidated on appeal before the Minnesota Supreme Court in Clark, 282 N.W.2d 902. The issue in Clark was whether the state had jurisdiction to enforce its gaming laws against Band members on non-Indian owned land within the thirty-two non-ceded townships within the Reservation. The court held (1) the Nelson Act did not disestablish the Reservation and therefore the state's jurisdiction was limited by 18 U.S.C. § 1162(b), Clark, 282 N.W.2d at 908; (2) the Indians have original rights to hunt and fish that were extinguished by the Treaty of February 22, 1855, 10 Stat. 1165, II Kappler 685, but were reacquired in the Treaty of 1867 and never thereafter extinguished, 282 N.W.2d at 908; and (3) the state lacks jurisdiction over Band members' hunting and fishing on the thirty-two townships within the Reservation, id. at 909.
 
 
 6
 Following the state court's decision in Clark, the district court granted the Band's motion to preclude further litigation of the disestablishment issue as it affected the thirty-two townships and issued a permanent injunction prohibiting the state from enforcing its gaming laws against Band members within the thirty-two townships. The state appellees, intervening counties, and individual intervenors[4] (hereinafter counties) challenge the preclusion order, arguing that a significant legal change renders collateral estoppel inapplicable and the purposes of collateral estoppel have not been met.
 
 
 7
 The district court also made the following findings: (1) the original thirty-six township Reservation has been diminished by cession of the four northeastern townships, White Earth Band v. Minnesota, 518 F.Supp. at 534, citing United States v. Minnesota, 466 F.Supp. 1382 (D.Minn.1979), aff'd sub nom. Red Lake Band of Chippewa Indians v. Minnesota, 614 F.2d 1161 (8th Cir.), cert. denied, 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980); (2) the Band may prohibit or condition entry onto Indian-owned or trust land within the Reservation by issuing permits or charging permit fees, but may not proceed against non-members in tribal courts, White Earth Band v. Minnesota, 518 F.Supp. at 535; and (3) the state could enforce its gaming laws against non-members on Indian-owned and trust lands, id. at 538. On appeal the Band challenges the first and third findings. The Band argues that the district court erred in holding that the four northeastern townships are not part of the Reservation because (1) authority to restore the four townships to reservation status is contained in the Indian Reorganization Act; (2) this case is distinguishable from United States v. Minnesota, 466 F.Supp. 1382; and (3) "checkerboard jurisdiction" is impractical and contrary to Congress' intent. The Band also argues that the district court erred in determining the state's authority to require licenses of non-members hunting on Indian land because the issue is not ripe for consideration.
 
 I. Issue Preclusion
 
 8
 The collateral estoppel doctrine "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979), citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 328-329, 91 S.Ct. 1434, 1442-1443, 28 L.Ed.2d 788 (1971).
 
 
 9
 In the present case the parties agree that the technical requirements of collateral estoppel are satisfied pursuant to the four-part analysis of Oldham v. Pritchett, 599 F.2d 274 (8th Cir. 1979). According to the Oldham court, collateral estoppel is appropriate where:
 
 
 10
 (1) the issue ... (is) ... identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privy with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.
 
 
 11
 Id. at 279.
 
 
 12
 However, the counties claim that application of the doctrine of collateral estoppel would be both unjust and against the underlying public interest. The Supreme Court has granted trial courts broad discretion in determining whether offensive collateral estoppel should be applied. Parklane Hosiery Co. v. Shore, 439 U.S. at 331, 99 S.Ct. at 651.
 
 
 13
 The counties first argue that the disestablishment issue is a legal issue and that there has been a significant change in the law so as to render the rule of collateral estoppel inapplicable, citing Commissioner v. Sunnen, 333 U.S. 591, 600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). In support the counties assert that the Clark court relied upon Leech Lake Band of Chippewa Indians v. Herbst, 334 F.Supp. 1001 (D.Minn.1971), to find that the underlying purpose of the Nelson Act was not disestablishment, but that after DeCoteau v. District County Court, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975) (DeCoteau ) and Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (Rosebud ), the same district court found that the purpose of the Nelson Act was restoration of lands to the public domain. United States v. Minnesota, 446 F.Supp. 1382. The counties argue that because restoration of Indian reservation lands to the public domain is synonymous with disestablishment, see, e.g., Rosebud, 430 U.S. at 588-89 nn.4 & 5, 97 S.Ct. at 1363-64 nn.4 & 5, DeCoteau, 420 U.S. at 426-27, 446, 448-49, 95 S.Ct. at 1084, 1094, 1095, the interpretation of the Nelson Act affirmed in Red Lake Band directly conflicts with the major premise of Clark. This, they argue, is a significant legal change rendering collateral estoppel inapplicable.
 
 
 14
 We disagree. Assuming arguendo that the disestablishment issue is a question of law, the "legal change" exception to collateral estoppel is not available here because the court in Clark had DeCoteau, Rosebud, and United States v. Minnesota before it when it found that the Nelson Act had not disestablished the thirty-two townships. The Clark court applied the correct standard to resolve the disestablishment issue. Citing Rosebud and DeCoteau, the Clark court stated "the standard to be applied in resolving the disestablishment issue is whether a clear congressional intent to terminate the reservation is discernible either from the fact of the act, the surrounding circumstances, or the act's legislative history." 282 N.W.2d at 907. The court in Clark correctly found that Rosebud and DeCoteau were consistent with Leech Lake insofar as the standard used in resolving disestablishment issue. Therefore, the "legal change" exception to collateral estoppel is not applicable.
 
 
 15
 The counties next argue that the collateral estoppel bar should not be applied because the purposes of the doctrine are not met in this case. The counties argue that the court must now decide the disestablishment issue of the four ceded townships which is essentially the same issue that was decided in Clark because in both the court must rely on the Nelson Act and the same legislative and administrative interpretations of that Act. We disagree. Although the Nelson Act is relevant to both inquiries, the four townships are subject to different provisions of the Act, see I Kappler at 301, H.R.Exec.Doc.No.247, 51st Cong., 1st Sess. 37 (1890), because no allotments of land to Indians were made in the four townships, White Earth Band v. Alexander, 518 F.Supp. at 533. Therefore, further inquiry into the status of the thirty-two township area would result in needless litigation. See Parklane Hosiery Co. v. Shore, 439 U.S. at 326, 99 S.Ct. at 649.
 
 
 16
 The counties also claim that application of the collateral estoppel bar in the present case will result in inconsistent decisions because of the conflict in law underlying the interpretation of the Nelson Act. We disagree. Differing conclusions on the issue of disestablishment of particular reservations may result from different fact situations rather than differing interpretations of the law. Indian law is in a state of flux; however, reopening litigation of this particular disestablishment issue would not minimize the possibility of differing adjudications on disestablishment issues. The Nelson Act treated various bands or tribes and reservations differently, Nelson Act, §§ 1, 3, I Kappler 301-03, 25 Stat. 642, 643, and contemplated that a separate agreement would be negotiated with individual bands or tribes pursuant to the Act. See I Kappler 301. When a court has determined disestablishment of a given reservation in its particular historical and factual setting, prevention of inconsistent adjudication becomes desirable insofar as it fosters reliance on judicial decision making.
 
 
 17
 We conclude that the district court did not abuse its discretion in finding that the counties had a full and fair opportunity to litigate their claims in Clark and are collaterally estopped from relitigating the question of disestablishment.
 
 
 18
 II. Reservation Status of the Four Northeastern Townships
 
 
 19
 Gaming rights are tied to the status of the four townships. If the four townships were ceded and never returned to reservation status, no Indian hunting and fishing rights exist within the four townships. In construing statutes which purportedly terminate the reservation status of any part of a reservation, the congressional intent to do so must be clear on the face of the statute, surrounding circumstances or legislative history, and doubtful expressions must be resolved in favor of the Indians. Rosebud, 430 U.S. at 586-87, 97 S.Ct. at 1362-63; DeCoteau, 420 U.S. at 444, 95 S.Ct. at 1092.
 
 
 20
 The four northeastern townships of the original Reservation were ceded to the United States by an agreement executed July 20, 1889, between the Band and the United States pursuant to the Nelson Act.[5] Approximately 2,900 of the ceded 92,000 acres in the four townships were returned to trust status after the enactment of the Indian Reorganization Act. On appeal the Band argues that the entire acreage of the four townships was restored to reservation status because the Nelson Act was never carried out to completion;[6] therefore, subsequent history should be considered in determining the status of the land. The Band claims the Indian Reorganization Act was an attempt to rectify the mistakes of the Nelson Act and restore self-government to the Indians. The Band suggests that the authority to restore the four townships is contained in the Indian Reorganization Act. However, the Band cites no authority for the theory that the Reorganization Act impliedly restored land to reservation status and nothing in the Act supports its argument. The Band's interpretation of the Act would have immense nationwide consequence by creating new reservations out of lands long ceded. We reject that interpretation and conclude that if Congress had intended such a result it would have been explicit.
 
 
 21
 We also reject the Band's argument that the district court's holding will create an impractical checkerboard pattern of conflicting state and tribal jurisdiction within the Reservation which the Supreme Court stated was contrary to congressional intent in Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). In Moe the Supreme Court interpreted Section 6 of the General Allotment Act, 24 Stat. 390, as amended 25 U.S.C. § 349, which provides that upon expiration of the trust patent period on allotted lands and the issuance of a patent in fee to an Indian, that land would become subject to state law. The Court in Moe held that the issuance of a fee patent under section 6 did not automatically take that piece of allotted land out of a currently existing reservation. 425 U.S. at 478, 96 S.Ct. at 1643. In contrast, the present case involves section 5 of the General Allotment Act which allows for the issuance of trust patents and for the cession of lands not allotted or needed for allotment upon terms agreed to by Congress. We conclude that Moe and its discussion of checkerboard jurisdiction is not relevant to cession agreements which were intended to diminish reservations. Furthermore, checkerboard jurisdiction is not automatically contrary to congressional intent, see, e.g., Title 18 U.S.C. § 1151(b) (1976), which defines "Indian country" as "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state." Weddell v. Meierhenry, 636 F.2d 211, 213 (8th Cir. 1980), cert. denied, 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981) (state has jurisdiction over Wagner, South Dakota even though it is located within the original Yankton Sioux Indian Reservation because it is not a dependent Indian community).
 
 
 22
 The district court found that United States v. Minnesota, 466 F.Supp. 1382, controlled the disposition of this issue. In United States v. Minnesota, the district court had earlier considered whether the Red Lake Band of Minnesota Chippewa Indians had relinquished their right, title and interest in lands ceded to the United States. That court examined the Nelson Act, its legislative history, the negotiations and relevant agreements in finding that all property rights in ceded lands had been terminated. The agreement signed by the Band in the present cases contains language identical to that in the Red Lake Agreement.[7] The district court in the present case found that the legislative history, surrounding circumstances and subsequent history indicate the Reservation was diminished by the four northeastern townships.
 
 
 23
 On appeal the Band attempts to distinguish United States v. Minnesota on the basis that the Red Lake Reservation contained aboriginal lands while the White Earth Reservation was created by treaty and contained ceded lands. The Band does not indicate what legal difference that should make as far as the cession agreements are concerned and we conclude that there is none for purposes of this case.
 
 
 24
 The district court carefully analyzed the Nelson Act, its legislative history, subsequent history, negotiation transcripts, and the cession agreement and found that Congress and the Band intended to disestablish the four northeastern townships and that the Indian Reorganization Act restored only 2,900 acres to the reservation. We affirm based on our conclusion that there is no support for the Band's theory that the Reorganization Act impliedly restored the entire four townships to reservation status.III. Tribal Sovereignty
 
 
 25
 The district court, relying on the test enunciated in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (Bracker ), found that state regulation over non-members on trust lands located within the Reservation had not been preempted by federal law and did not impinge upon the Band's right of self government. Therefore, non-members hunting or fishing on trust lands within the Reservation are subject to licensing regulation by both the Band and the state.[8] On appeal the Band concedes that Bracker is the correct standard but argues that the district court erred in reaching the dual regulation on trust lands issue because it was not ripe. In support the Band asserts that the record was incomplete, that federal preemption on trust lands was not an issue in the case, the United States has not yet taken a position on the issue of federal preemption, and there was no examination of the Band's or the United States' activities with regard to wildlife resources on tribal lands. The Band requests this court to vacate the district court's judgment with respect to this issue so that it can develop a conservation program which it claims would be a relevant factor in a subsequent Bracker inquiry. In response the state argues that the issue was ripe noting that it had been placed before the court by the Band. We agree.
 
 
 26
 In its complaint the Band sought a declaration that it could enforce its regulations against anyone within the boundaries of the Reservation and that the state could not enforce state gaming laws against anyone anywhere, including on trust land, within the boundaries of the Reservation. The Band thereby presented the issue in its complaint and addressed the merits of state regulatory authority before the district court. As noted by the district court,
 
 
 27
 We reject the Band's argument that we should decline to decide the narrower issues presented here pertaining to Indian owned and trust lands, and should await a more clearly defined controversy. This litigation is now seven years old; the interested parties are before the court; and both the Band and the State defendants have expressed a policy and intent to exercise regulatory authority over non-Indian hunting, fishing and wild rice gathering on Indian-owned and trust lands. The issues are squarely before this court; it is appropriate to render a decision.
 
 
 28
 White Earth Band v. Alexander, 518 F.Supp. at 534 n.4. We conclude that the district court properly reached this issue.
 
 
 29
 To determine state authority over non-member activities within the Reservation requires a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law. Bracker, 448 U.S. at 145, 100 S.Ct. at 2585. The state has a strong legitimate interest in regulation of hunting and fishing because of its investment in and historic management of reservation game and fish resources. The Band's right to hunt, fish and gather wild rice is an attribute of its inherent sovereignty. The Band argues that the district court overvalued the state's interest and ignored significant interests of the Band.
 
 
 30
 The district court applied Bracker 's two-prong test to determine state authority: (1) whether the exercise of state authority has been preempted by federal law, and (2) whether the exercise of state authority unlawfully infringes on the Band's right to make its own laws and be ruled by them. Id. at 142, 100 S.Ct. at 2582. Considering the first prong, the district court appears to hold that the lack of direct evidence of a federal intent to preempt is fatal to the Band's argument. The Supreme Court, however, has rejected the notion that "an express Congressional statement" is necessary to find federal preemption. Id. at 144, 100 S.Ct. at 2584, citing Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). The district court found that the Band's inherent sovereignty is "only" a backdrop in determining whether there has been federal preemption, citing Bracker. The Supreme Court, however, stated that tribal sovereignty is an "important 'backdrop,' against which vague or ambiguous federal enactments must always be measured." Bracker, 448 U.S. at 143, 100 S.Ct. at 2583 (citations omitted and emphasis added).
 
 
 31
 Under the second prong of the Bracker test, the district court found the Band would suffer no economic hardship from a dual license requirement because non-members would probably obtain both permits so as to be protected from the possibility of inadvertently hunting or fishing on Indian-owned or trust lands without the required permit. The district court also found that state jurisdiction over non-members in the reservation did not infringe on the right of the Band to make their own laws and be governed by them, citing Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).
 
 
 32
 Although we think that the district court could have delved deeper into the interrelationship of the various state, federal, and tribal economic, conservation, revenue, and governmental policy interests, see White Mountain Apache Tribe v. Arizona, 649 F.2d 1274 (9th Cir. 1981), and would ordinarily be inclined to remand this issue for consideration of the "relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence," Bracker, 448 U.S. at 144-45, 100 S.Ct. at 2584, we conclude that a remand would serve no useful function here because the Band has not met its burden of showing that the state's gaming laws were unreasonable and unrelated to its regulatory authority. See Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 160, 100 S.Ct. 2069, 2084, 65 L.Ed.2d 10 (1980).[9]
 
 
 33
 Accordingly, we affirm the district court's judgment.
 
 
 
 [1]
 The Honorable Edward J. Devitt, United States Senior District Judge for the District of Minnesota
 
 
 [2]
 Townships 146, 145, 144 and 143 North of Range 37 West
 
 
 [3]
 "Non-member" is used instead of "non-Indian" because Indians who are not members of the Band are treated as non-Indians with regard to hunting, fishing, and wild rice gathering on the Reservation. See Washington v. Confederated Tribes of Colville, 447 U.S. 134, 161, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980), rehearing denied, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980)
 
 
 [4]
 The State of Minnesota joined the appeal only to preserve its position from res judicata if the counties' position is adopted
 
 
 [5]
 Pursuant to the Nelson Act, a Commission was appointed by the United States to negotiate with the Minnesota Chippewa Bands for cession of certain lands. The purpose of the Act was to assimilate Indians into non-Indian society by breaking up the reservation system. See H.R.Rep.No.789, 50th Cong., 1st Sess. 6 (1888). The agreement provided the Band did "grant, cede, relinquish and convey to the United States all ... (their) ... right, title, interest in and to all and so much of said ... Reservation as is not embraced in the following described boundaries ..." (following is a description of the 32 townships excluding the northeastern four townships) H.R.Exec.Doc.No.247, supra, at 37)
 
 
 [6]
 The Act was to effect a gradual transition from tribal relations to full emancipation. Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 221, 50 S.Ct. 320, 325, 74 L.Ed. 809 (1930). This purpose has never been accomplished
 
 
 [7]
 The agreement provided the Red Lake Band did "grant, cede, relinquish, and convey to the United States all ... (their) ... right, title, and interest in and to all and so much of said ... Reservation as is not embraced in the following described boundaries ..." H.R.Exec.Doc.No.247, supra, at 28; United States v. Minnesota, 466 F.Supp. at 1385
 
 
 [8]
 The Band has a 61/2 week deer season, the state's deer season is nine days long. The Band permits 150 antlerless deer to be killed, the state permits no killing of such deer. The Band also has longer seasons for hunting small game and trapping fur-bearing animals
 
 
 [9]
 It should be noted that Congress could choose to preempt state authority, but there is no indication of an imminent federal enactment regarding preemption