**Arthur GRUBBS, Frank Jetton, et al., Plaintiffs,**

v.

**UNITED MINE WORKERS OF AMERICA, et al., Defendants.**

Civ. No. 87–2207.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Feb. 21, 1989.

Joseph C. Self, Sexton Law Firm, Fort Smith, Ark., for plaintiffs.

William F. Hanrahan, Thomas S. Gigot, Andrew A. Chakeres, Groom & Nordberg, Chartered, Washington, D.C., James J. Glover, Isaac A. Scott, Jr., Wright, Lindsey & Jennings, Little Rock, Ark., Israel Goldowitz, Deputy Gen. Counsel, Glenda S. Finch, Sr. Associate Counsel, UMWA Health & Retirement Funds, Gerald E. Cole, Jr., Washington, D.C., for United Mine Workers of America 1974 Ben. Plan and Trust.

James O. Cox, Fort Smith, Ark., pro se.

Thomas E. Robertson, Jr., Bethell, Callaway, Robertson & Beasley, Fort Smith, Ark., for James O. Cox, Trustee of Garland Coal and Min. Co.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This case is currently before the court on plaintiffs' motion for summary judgment on the issue of liability. At issue are the interpretations of the National Bituminous Coal Wage Agreement and the United Mine Workers of America 1974 Benefit Plan and Trust, a multi-employer welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461.

The history of the 1974 Benefit Plan and the various related National Bituminous Coal Wage Agreements is somewhat involved. An excellent recapitulation of the development and interplay of these agreements is set forth in *District 29, UMWA v. UMWA 1974 Benefit Plan*, 826 F.2d 280 (4th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988) ("Royal II").

Briefly stated, the National Bituminous Coal Wage Agreement of 1946 created a welfare and retirement fund as well as a medical and hospital fund, for coal miners. From 1946 to 1974, the trustees of the fund, by resolution, established medical and retirement benefits for UMWA miners, including monthly pensions and health benefits for retirees during their lifetimes. The fund was supported by coal royalties produced by signatory employees.

In 1974 the UMWA and BCOA agreed to continue the fund in the form of four separate trusts—the 1950 Pension Trust, the 1950 Benefit Trust, the 1974 Pension trust and the 1974 Benefit Trust. The former two trusts provided benefits to previous retirees and the latter two provided benefits for subsequent retirees. As a result of financial difficulties, the successor 1978 wage agreement transferred the primary responsibility for employee benefits to separate plans to be established by individual signatory employers, but the 1974 Benefit Plan was retained as a "safety net" for "orphaned" petitioners who subsequently lost their entitlement to benefits under the separate plans established by the employers. It is the scope of the "safety net" that is at issue in this case.

The 1974 Benefit Plan contains a provision stating that certain retired miners whose last employer is "no longer in business" will be eligible to receive benefits from the 1974 Benefit Plan. Article II.E of the 1974 Benefit Plan, as amended, defines "no longer in business" as being:

[F]inancially unable (through either the business entity that has ceased operations as described in subparagraph a, above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by the 1978, 1981, 1984 Wage Agreement, whichever is applicable or not) to provide health and other non-pension benefits ...

The 1974, 1978, 1981, and 1984 Wage Agreements provide, however, that pensioners are entitled to retain a health services card for life and surviving widows may retain a health services card until death or remarriage. Since the 1950's retired mine workers had been provided with health benefits as a vested lifetime benefit under the UMWA Welfare and Retirement plan. The 1978 Wage Agreement expressly provides that the 1974 Benefit Plan shall continue during the term of the agreement for the purpose of providing health and non-pension benefits to any retired miner under the 1974 Pension Plan, who would otherwise cease to receive the benefits because the signatory employer from which he is retired is no longer in business.

The plaintiffs are former employees of Garland Coal and Mining Company and are members of the UMWA. Garland is in bankruptcy. Plaintiffs were all last employed by Garland in 1981, during the term of the 1978 Wage Agreement. Garland was not a party to any subsequent Wage Agreement. Thus, Garland's obligation to provide benefits ceased in 1981. *See District 29 UMWA v. Royal Coal Co.,* 768 F.2d 588 (4th Cir.1985).

The defendant, 1974 Benefit Plan, argues that Garland does not satisfy the "financially unable" component of the Plan's requirement because its assets exceed five million dollars after payment of booked liabilities. Because Garland is "financially able" to pay benefits, the Plan contends that the Plan's requirements are not satisfied and therefore the Plan is not obligated to pay benefits. Even if financially able to do so, however, Garland is not legally obligated to pay benefits because the 1978 Wage Agreement expired in 1981. The Plan thus concludes that no one is obligated to pay any benefits to the plaintiffs.

■ The legal issue presented is this—is the 1974 Benefit Plan and Trust obligated to pay benefits to the plaintiffs if Garland is financially able, but not obligated, to do so. This precise issue has been addressed by the Fourth Circuit Court of Appeals on more than one occasion in a case involving the 1974 Benefit Plan and Trust. In *District 29, UMWA v. Royal Coal Co.,* 768 F.2d 588 (4th Cir.1985), plaintiffs sued on behalf of a group of approximately 60 pensioners last employed by Royal Coal Company. Royal was signatory to the 1981 Wage Agreement, but not the 1984 Agreement, and ceased paying benefits at the end of the 1981 Agreement. The 1974 Benefit Plan refused to pay the benefits to the pensioners because Royal had a solvent parent company and therefore did not qualify as being no longer in business. The District Court granted a preliminary injunction requiring Royal to provide benefits. Royal appealed and the Fourth Circuit reversed, holding that the obligation of the employer to provide the benefits did not survive the expiration of the collective bargaining agreement. The Court of Appeals remanded the case to the District Court to determine whether the 1974 Benefit Plan and Trust was responsible for paying the benefits.

On remand, the District Court granted a preliminary injunction requiring the 1974 Benefit Plan to provide benefits. The District Court reviewed the National Bituminous Coal Wage Agreements of 1946–50, 1974, 1978, 1981, and 1984 resolutions of the UMWA Welfare and Retirement Fund from 1946 to 1974, benefit plans and summary plan descriptions for the 1974 Benefit plan as set forth in the 1974, 1978, 1981, and 1984 wage agreements, public statements of the BCOA pertaining to the 1978 negotiations, memoranda of the UMWA Health and Retirement Funds regarding the "no longer in business" language after the 1978 and 1981 agreements, and minutes of meetings of the trustees, as well as numerous other documents and the testimony of the BCOA and UMWA representatives in the 1978, 1981, and 1984 negotiations. The District Court held that the benefits in question were clearly intended to be vested, lifetime benefits and that the 1974 Benefit Plan and Trust was obligated to provide benefits to the Royal pensioners once Royal was no longer legally obligated to do so.

The 1974 Benefit Plan appealed. The case was regarded by all parties as a test

case on the issue. The Fourth Circuit affirmed, concluding that the voluminous evidence clearly indicated a mutual intent to provide retirement health benefits for life, despite the literal terms of the agreement. According to the court, the 1974 Benefit plan and Trust was established and continued in order to supply the health benefit needs of "orphaned" retirees. The Fourth Circuit found ample support for the District Court's conclusion that the 1974 Benefit Plan was intended to provide health benefits where the retiree's last signatory employer is no longer able *or* required to provide such benefits.

In *District 17, UMWA v. Allied Corporation*, 735 F.2d 121 (4th Cir.1984), on rehearing *en banc*, 765 F.2d 412 (4th Cir. 1985) *cert. denied*, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), Allied sold its coal mining operations during the term of the 1978 Agreement without securing the agreement of the purchasers to assume the pension liabilities, in violation of the successorship clause of the 1978 Agreement. Allied continued to pay benefits until 1982. District 17 and representative pensioners sued Allied, its successor, and the 1974 Benefit Plan. The District Court found that Allied's liability continued beyond the expiration of the 1978 Agreement because the loss of benefits was a foreseeable consequence of Allied's failure to obtain the assumption of pension liability from the purchasers as required by the 1978 Agreement.

On appeal, a panel of the Fourth Circuit Court of Appeals held that Allied's obligations expired at the end of the 1978 Agreement and that the 1974 Benefit Plan was obligated to pay the benefits to avoid the "orphaning" of retired miners. On rehearing *en banc*, the Court of Appeals affirmed the decision of the District Court. Judge Sprouse, in *dicta*, stated that the 1974 Benefit Plan would have been responsible if neither Allied nor the purchasers had been.

*Schifano v. UMWA 1974 Benefit Plan and Trust*, 655 F.Supp. 200 (N.D.W.Va. 1987) was an action by 17 pensioners last employed by South Union Coal Company, a

signatory to the 1978 and 1981 Agreements. South Union filed for bankruptcy in 1981. Although the 1974 Benefit Plan initially paid benefits, it reversed that decision because South Union had a parent corporation that was able to do so. The District Court ruled that the "no longer in business" language relied upon by the 1974 Benefit Plan presupposes that there is a legal duty to provide benefits and that where no employer had such a duty, the 1974 Benefit Plan was obligated to pay the benefits. *In accord, Crockett, et al. v. Vecillio and Grogan, et al.*, No. 1:85–1448 1987 WL 60303 (S.D.W.Va., Feb. 4, 1987).

Plaintiffs in this case seek to invoke the doctrine of non-mutual offensive collateral estoppel against the 1974 Benefit Plan, precluding the Plan from relitigating the same issue in this court. It is clear that the issue is identical to that presented in *Royal II* and *Schifano* and is a question of construction of the collective bargaining agreements, plan documents and indicia of the intent of the parties. The same entity, the 1974 Benefit Plan, was a party to all proceeding in *Royal, Royal II, Schifano*, and *Crockett*. The same plan documents were involved, as well as the identical bargaining agreements and other indicia of the parties' intentions. Further, the 1974 Benefit Plan had a full and fair opportunity to litigate this issue, numerous times. In *Royal* and *Royal II*, the parties stipulated that much of the record in *Allied* should be included in the evidence, and presented additional documentary evidence and witnesses. The plaintiffs in this case are located hundreds of miles from the trial courts in those cases and could not easily have joined as parties, even had they been given notice. At no time did the 1974 Benefit Plan and Trust seek to consolidate all pending claims nor certification of a single class. It is obvious that the Plan regarded *Royal* as a test case as did the court, and it was litigated accordingly. There are, to this court's knowledge, no procedural opportunities available in this proceeding not available in *Royal*. The court perceives no "unfairness" in precluding the Plan from relitigating the same issue *ad infinitum*. Although the doctrine of non-mutual offensive collateral estoppel

should be cautiously invoked, it is appropriate here. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Laboratories v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *White Earth Band of Chippewa Indians v. Alexander,* 683 F.2d 1129 (8th Cir.1982); *Oldham v. Pritchett,* 599 F.2d 274 (8th Cir.1979); *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3rd Cir.1974) *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); *Zdanok v. Glidden Co.,* 327 F.2d 944 (2nd Cir.1964).

Finally, the court has carefully reviewed the materials submitted by the parties in support of their respective positions. The court concludes that the material facts are not in dispute and that the interpretation of the relevant documents is essentially a question of law. As a matter of simple common sense, it seems fairly obvious that the ability of an employer, successor, related company, or transferee to pay pension or other benefits is completely irrelevant unless the employer, successor, related company or transferee has a legal obligation to do so. It is, of course, possible to expressly condition liability on the occurrence or non-occurrence of immaterial and unrelated facts if that be the intent of the parties. This court is not empowered to review for reasonableness the provisions of a collective bargaining agreement allocating health benefits, however irrational or unwise, if that be the intent of the parties. Likewise, however, vested benefits may not be altered without the pensioner's consent. *See UMWA Health and Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). There is no support in the record for the contention that the pensioners through their representatives, purposely agreed to divest themselves of vested pension rights in favor of a scheme that would condition their receipt of pension benefits upon the financial condition of an entity that has no obligation to pay benefits.

From 1950 to 1974, the benefits available to retired or disabled miners and their families were never decreased or eliminated and beneficiaries were entitled to receive pension and health benefits for life. The 1974 Wage Agreement entitled a pensioner to retain his health services card for life, and a widow until death or remarriage. When the 1974 Benefit Plan was threatened financially due to a decline in royalty payments, the BCOA proposed eliminating the 1974 Benefit Plan in favor of individual employer plans. This was resoundingly rejected by the UMWA, and after negotiations, the 1978 Wage Agreement was approved, which, as noted continued the plan for the purpose of providing benefits to retired miners who would cease to receive benefits because the signatory employer was "no longer in business".

In light of the decades of history of the intent of the parties which were relied upon in establishing the current benefit and pension scheme to provide for disabled and retired miners in the twilight of their lives, it is obvious that none of the interested parties intended to condition the receipt of benefits on facts completely irrelevant to the receipt of benefits. To condition receipt of pension and health benefits on the financial condition of an employer which has no legal obligation to pay those benefits is as incomprehensible as rendering the fruits of lifelong toil contingent upon the amount of annual rainfall in Siberia.

■ To enforce the literal terms of the "no longer in business" language while ignoring the history behind the 1974 Benefit Plan would result in a forfeiture of benefits to "orphaned" miners. ERISA requires the disclosure and reporting to participants and beneficiaries of financial and other information regarding employee benefits plans covered by the Act. *See* 29 U.S.C. § 1001(b). That requirement specifically includes the requirement that such disclosures and summary plan descriptions include a statement clearly identifying circumstances which may result in loss, forfeiture or suspension of any benefit that a participant might otherwise reasonably expect the plan to provide on the basis of the Summary Plan Description's description of benefits. *See 29 C.F.R.* § 2520.102–3(1). In the absence of disclosure, an ERISA fiduciary may be precluded from enforcing

**128**

the forfeiture provisions. *See Genter v. Acme Scale & Supply Co.*, 776 F.2d 1180 (3rd Cir.1985); *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1985).

Only by completely ignoring the relevant wage agreements, the overall purpose of the 1974 Benefit Plan, the Summary Plan Description, and decades of history could one believe that plan beneficiaries were informed that their entitlement to benefits was contingent upon a coincidental happenstance. On the contrary, it is apparent that the method of payment and source of benefits was altered by the 1978 Wage Agreement, but not the entitlement to benefits. The Wage Agreement of 1974 has no less than three references to the lifetime *entitlement* to benefits.

Suffice it to state that the decision of the trustees denying benefits under the 1974 Benefit Plan and Trust was arbitrary and capricious. Plaintiffs motion for partial summary judgment will be granted. Trial of this matter will be confined to the issues of plaintiffs' individual eligibility for benefits under the 1974 Benefit Plan and Trust.

A separate order in accordance herewith will be concurrently entered.